1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | CASE NO. |
| KATRINA ARENA and<br>ANGELO ARENA,<br><br>      Plaintiffs,<br><br>      v.<br><br>JONAK INC.,<br>FRANK DANGELO,<br>DIANE DANGELO,<br>NICHOLAS DANGELO,<br>THOMAS SOLOMON and<br>DANIEL KUBIAK,<br><br>      Defendants. | **COMPLAINT FOR CIVIL MONEY PENALTIES**<br><br>[Article 7 of the New York State Estate, Powers and Trusts Law, Article 4 of the New York State Business Corporation Law, Article 6 of the New York State Business Corporation Law, Article 7 of the New York State Business Corporation Law, Article 11 of the New York State Business Corporation Law, Title 8 of the New York State Education Law, Rules of the Internal Revenue Service, Breach of Fiduciary Duty, Breach of Contract, Fraud, Constructive Fraud, Fraudulent Concealment, Negligence, Gross Negligence, Negligent Misrepresentation, Intentional Infliction of Emotional Distress, Defamation, Aiding and Abetting Fraud, Aiding and Abetting Another's Breach of Fiduciary Duty] |

COMPLAINT

1

**COMPLAINT FOR CIVIL MONEY PENALTIES**

2

Table of Contents

3      I. Introduction ........................................................... 1

4      II. Relevant Law ......................................................... 2

5      III. Jurisdiction and Venue ............................................. 8

6      IV. Parties ................................................................. 8

7      V. Background ........................................................... 9

8      VI. Claims for Relief ................................................... 43

9      VII. Prayer for Judgement .............................................. 46

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

COMPLAINT

Plaintiffs, Katrina Arena ("Mrs. Arena") and Angelo Arena ("Mr. Arena") (collectively "The Arena's"), allege and complain against defendants, Jonak Inc. ("Jonak"), Frank DAngelo ("Mr. DAngelo"), Diane DAngelo ("Ms. DAngelo"), Nicholas DAngelo ("Nicholas") (please note that referring to Nicholas DAngelo, or any other party within this complaint, on a first name basis is not intended to be done with any disrespect, but instead necessary to differentiate the parties), Thomas Solomon ("Mr. Solomon")  and Daniel Kubiak ("Mr. Kubiak") as follows:

## I. INTRODUCTION

1.    The Arena's bring this action pursuant to Article 7 of the New York State Estate, Powers and Trusts Law, Article 4 of the New York State Business Corporation Law, Article 6 of the New York State Business Corporation Law, Article 7 of the New York State Business Corporation Law, Article 11 of the New York State Business Corporation Law, Title 8 of the New York State Education Law, Rules of the Internal Revenue Service, Breach of Fiduciary Duty, Breach of Contract, Fraud, Constructive Fraud, Fraudulent Concealment, Negligence, Gross Negligence, Negligent Misrepresentation, Intentional Infliction of Emotional Distress, Defamation, Aiding and Abetting Fraud and Aiding and Abetting Another's Breach of Fiduciary Duty, to recover civil money penalties from defendants for: (a) the deliberate failure on behalf of Mr. DAngelo to transfer to Mrs. Arena her Uniform Transfer to Minor Act ("UTMA") property after attaining the age of 21, (b) the deliberate failure on behalf of Ms. DAngelo to transfer to Mrs. Arena her UTMA property after attaining the age of 21, (c) the intentional oppressive, reckless and negligent behavior against The Arena's by Jonak, Mr. DAngelo, Ms. DAngelo, Nicholas, Mr. Solomon and Mr. Kubiak, (d) the deliberate looting, wasting and diversion of Jonak's assets by Mr. DAngelo to (1) only benefit his personal and financial interests and (2) cause harm to The Arena's, (e) failing to provide legally required documents, including, but not limited to, Mrs. Arena's Schedule K-1's and Jonak's annual balance sheets and profit and loss statements, (f) the failure on behalf of Mr. DAngelo and Jonak to hold annual shareholder meetings and if shareholder meetings were held, deliberately failing to notify Mrs. Arena of such meetings and deliberately failing to provide Mrs. Arena's counsel with any records relating to such meetings, (g) deliberately denying Mrs. Arena her right to liquidate her shares with the sole intent of (1) causing maximum harm against The Arena's and (2) allowing Mr. DAngelo to continue his fraud of using Jonak capital as his personal piggy bank, (h) making false and misleading

1

statements of material fact, (i) deliberately denying Mrs. Arena any and all of her legal and contractual rights as a shareholder, while Jonak and Mr. DAngelo have engaged in fraudulent, deceptive and manipulative practices against Mrs. Arena, (j) the fraudulent filing of Mrs. Arena's 2009 New York State and Federal tax return by Mr. Kubiak and Mr. DAngelo, (k) the negligent and illegal conduct by Mr. Kubiak in concealing a Form 1099 used on Mrs. Arena's 2009 tax returns that he fraudulently filed with the intent to conceal information related to Mrs. Arena's UTMA property, thereby aiding and abetting Mr. DAngelo and Ms. DAngelo in not returning to Mrs. Arena her UTMA property, (l) the negligent, oppressive and illegal conduct by Mr. Kubiak in refusing to furnish to Mrs. Arena her tax return information, (m) the negligent, fraudulent and bad faith conduct by Nicholas in assisting Mr. DAngelo carry out his fraud, (n) Mr. Solomon's deliberate aiding and abetting of the fraud, oppression, gross negligence and false statements made on behalf of Jonak and Mr. DAngelo and (o) the intentional defamation by Mr. Solomon and resulting harm caused against The Arena's.

## II. RELEVANT LAW

2. Article 7 of the New York State Estate, Powers and Trusts Law

    a. Part 6 of Article 7 defines the Uniform Transfer to Minor Act states that any transfer of property to a minor under the act (1) is an irrevocable gift and (2) must be unconditionally transferred to the minor upon the minor attaining the age of 21.

3. Article 4 of the New York State Business Corporation Law

    a. New York State Business Corporation § 402(b) states, "The certificate of incorporation may set forth a provision eliminating or limiting the personal liability of directors to the corporation or its shareholders for damages for any breach of duty in such capacity, provided that no such provision shall eliminate or limit: (1) the liability of any director if a judgment or other final adjudication adverse to him establishes that his acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that he personally gained in fact a financial profit or other advantage to which he was not legally entitled or that his acts violated section 719."

4. Article 6 of the New York State Business Corporation Law

    a. New York State Business Corporation § 602(b) states that an annual shareholder meeting must be held.

2

COMPLAINT

b.  New York State Business Corporation Law § 624(b) states that upon at least five days written demand, the shareholder, shareholder's agent or shareholder's attorney may examine (1) the minutes of the proceedings of its shareholders and (2) the record of the shareholders, and that extractions can be made therefrom.

c.  New York Business Corporation Law § 624(e) states, "Upon the written request of any shareholder, the corporation shall give or mail to such shareholder an annual balance sheet and profit and loss statement for the preceding fiscal year, and, if any interim balance sheet or profit and loss statement has been distributed to its shareholders or otherwise made available to the public, the most recent such interim balance sheet or profit and loss statement."

5.  Article 7 of the New York State Business Corporation Law

a.  New York State Business Corporation Law § 715(h) states that an officer must perform their duties in good faith and "with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

b.  New York State Business Corporation Law § 718(a) states that if a shareholder, or the attorney of the shareholder, makes a written demand to inspect the current list of its directors and officers, the corporation must make the list available within 2 business days.

c.  New York State Business Corporation Law § 720 states that an action may be brought against a director or officer of a corporation for relief. In particular, § 720(1)(A) states that relief can be sought for "The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge" and § 720(1)(B) states that relief can be sought for "The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

6.  Article 11 of the New York State Business Corporation Law

a.  New York State Business Corporation Law § 1118 allows for alternatives to judicial dissolution under New York Business Corporation Law § 1104-a, including the purchase of the petitioners shares from the corporation or shareholder(s).

b.  New York Business Corporation Law § 1104-a states that a shareholder representing 20% of all outstanding shares may petition for a dissolution on one or more of the following

3

COMPLAINT

grounds: (1) the directors or those in control of the corporation have been guilty of illegal, fraudulent or oppressive actions towards the complaining shareholder(s) or (2) the property or assets of the corporation are being looted, wasted, or diverted for non-corporate purposes by its directors, officers or those in control of the corporation.

  c. In Wiedy's Furniture Clearance Center Co., 108 A.D.2d 81 (1985), Justice Weiss made it clear that (1) the court must consider alternatives to dissolution, (2) dissolution is not an all or nothing and (3) the court has broad alternative remedies. In doing so, the court ordered a buy-out of the petitioner's interest opposed to a dissolution.

  d. In Kaplan v. First Hartford Corp., 2009 WL 737681 (D. Me. Mar. 20, 2009), Justice Hornby of the United States District Court of Maine is presented with a diversity case involving oppression against a shareholder by the corporation, which has vast similarities to the spirit of The Arena's complaint against Jonak and Mr. DAngelo. In particular, Justice Horby concludes, "What should this Maine corporation's minority shareholder recover upon a judicial finding of oppression by a director/ controlling shareholder? I conclude that the remedy is a compulsory buy-out of the minority shareholder." It is important to note that (1) Maine has nearly identical laws as New York regarding the dissolution of a corporation and the alternative options to such a dissolution and (2) this case was much more complicated than The Arena's complaint in that it involved a publicly traded corporation with over 800 shareholders. Additionally, it is important to note that in light of Justice Hornby stating, "Oppression relief statutes were designed for closely held corporations," he ruled in the manner he did for a publicly traded corporation with over 800 shareholders and with circumstances much less oppressive than what The Arena's are facing.

  7. Title 8 of the New York State Education Law

  a. Under New York law, professional misconduct of licensed professionals, inclusive of Certified Public Accountants, is defined in § 6509(9). Specifically, it defines unprofessional conduct as "committing unprofessional conduct, as defined by the board of regents in its rules or by the commissioner in regulations approved by the board of regents."

  b. Part 29 of the New York State Board of Regents provides substantial definitions as to what defines unprofessional conduct. The most relevant definitions of unprofessional conduct are as

follows: (1) § 29.1(5) - conduct in the practice of a profession which evidences moral unfitness to practice the profession, (2) § 29.1(8) - revealing of personally identifiable facts, data or information obtained in a professional capacity without the prior consent of the patient or client, except as authorized or required by law, (3) § 29.1(11) - performing professional services which have not been duly authorized by the patient or client or his or her legal representative, (4) § 29.10(a)(8) - refusing to furnish to a client upon request: (i) copies of tax returns; or (ii) copies of reports or their documents that were previously issued to or for such client; or (iii) any accounting or other records belonging to or obtained for the client which the public accountant may have had occasion to remove from the client's premises or to receive for the client's account; but this shall not preclude making copies of such documents when they form the basis for work done by the licensee; but in no event shall the public accountant have a lien on these accounting or other records; or (iv) copies of information contained in an accountant's working papers, if such information would ordinarily constitute part of the client's books and records and is not otherwise available to the client. Such information shall include client owned records or records which the licensee receives from a client. In addition, it shall include any records, tax returns, reports, or other documents and information which are contained in an accountant's working papers that were prepared for the client by the accountant and for which the accountant has received payment from the client, and (5) § 29.10(c) - unprofessional conduct shall also include revealing of personally identifiable facts, data or information obtained in a professional capacity without the prior consent of the client, except such information may be disclosed as necessary to other licensees of the profession conducting professional standards or ethics reviews, or as otherwise authorized or required by law.

        8.     Rules of the Internal Revenue Service

             a.     Instructions for Form 1120S (2013), page 21, states, "Purpose of Schedules: The corporation is liable for taxes on lines 22a, 22b, and 22c, on page 1 of Form 1120S. Shareholders are liable for tax on their share of the corporation's income (reduced by any taxes paid by the corporation on income). Shareholders must include their share of the income on their tax return whether or not it is distributed to them. Unlike most Partnership income, S corporation income is not self-employment income and is not subject to self-employment tax."

             b.     Instructions for Form 1120S (2013), page 21, states, "Schedule K-1: Schedule K-1

5

COMPLAINT

shows each shareholder's separate share. Attach a copy of each Schedule K-1 to the Form 1120S filed with the IRS. Keep a copy for the corporation's records and give each shareholder a copy. Give each shareholder a copy of the Shareholder's Instructions for Schedule K-1 (Form 1120S) or specific instructions for each item reported on the shareholder's Schedule K-1."

      c.    Instructions for Form 1120S (2013), page 2, states, "When to File: An S corporation must file Form 1120S by the 15th day of the 3rd month after the end of its tax year."

9.    Breach of Fiduciary Duty

      a.    Under New York law, there are three elements required to support a claim for breach of fiduciary duty: (1) the existence of a fiduciary relationship between the parties, (2) the defendant breached that duty and (3) the plaintiff was damaged as a result of the breach.

      b.    In Tucker Anthony Realty Corp v. Schlesinger, 888 F.2d 969, 973 (2d Cir. 1989), Justice Cardamone stated, "New York makes no distinction between the fiduciary duty owed by a general partner and that owed by a corporate director. One is not greater, and the other lesser. Both are bound by the same rule of fair-dealing with limited partners or shareholders who rely on the integrity of the general partner and corporate directors who are empowered under N.Y. Partnership Law Sec. 98 (McKinny 1988) and N.Y.Bus.Corp.Law Sec. 701 (McKinney 1988), respectively, to manage the business into which those passive investors have placed their funds."

10.    Breach of Contract

      a.    Under New York law, there are four elements required to support a claim for breach of contract: (1) a valid and enforceable contract, (2) the plaintiff's performance of the contract, (3) breach by the defendant and (4) damages (see Remis v. Fried 2011 NY Slip Op 50479(U)).

11.    Fraud

      a.    Under New York law, there are five elements required to support a claim for fraud: (1) representation of a material fact, (2) falsity, (3) scienter, (4) reasonable reliance and (5) injury (see Kline v. Taukpoint Realty Corp., 302 AD2d 433 (2d Dept 2003)).

12.    Constructive Fraud

      a.    Under New York law, there are six elements required to support a claim for constructive fraud: (1) a false misrepresentation, (2) in reference to a material fact, (3) for the purpose of

6

COMPLAINT

inducing the other party to rely on such representation, (4) on which the other party did justifiably rely, (5) which resulted in damages or injury and (6) a fiduciary relationship between the parties existed (see Hagarty v. Ithaca City School District, 423 N.Y.S. 2d 843 (1979)).

13. Fraudulent Concealment

    a. Under New York law, there are six elements required to support a claim for fraudulent concealment: (1) a duty to disclose material facts, (2) knowledge of material facts by a party bound to make such disclosures, (3) failure to discharge a duty to disclose, (4) scienter, (5) reliance and (6) damages (see Woods v. Maytag Co., 807 F.Supp.2d 112 (2011)).

14. Negligence

    a. Under New York law, there are four elements required to support a claim for negligence: (1) the defendant owes the plaintiff a "duty, or obligation, recognized by law", (2) a breach of the duty, (3) a reasonably close causal connection between (the defendant's) conduct and the resulting injury and (4) loss or damage resulting from the breach (see McCarthy v. Olin Corp., 119 F.3d 148 (2d Cir. 1997)).

15. Gross Negligence

    a. Under New York law, gross negligence is defined as conduct that evinces a reckless disregard for the rights of others or that smacks of intentional wrongdoing (see Fed. Ins. Co. v. Automatic Burglae Alarm Corp. 208 A.D.2d 495 (1994)).

16. Negligent Misrepresentation

    a. Under New York law, there are five elements required to support a claim for negligent misrepresentation: (1) defendants had a duty, as a result of a special relationship, to give correct information, (2) defendants made a false representation that they should have known was incorrect, (3) defendants knew plaintiff desired for a serious purpose the information supplied in the representation, (4) plaintiff intended to rely and act upon it and (5) plaintiff reasonably relied on it to his detriment (see Meisel v. Grunberg, 651 F. Supp.2d 98, 34 (S.D.N.Y. 2009)).

17. Intentional Infliction of Emotional Distress

    a. Under New York law, there are four elements required to support a claim for intentional infliction of emotional distress: (1) outrageous conduct that exceeds the bounds of decency

7

COMPLAINT

tolerable in civilized society, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and injury, and (4) severe emotional distress (see Remis v. Fried 2011 NY Slip Op 50479(U)).

       18.     Aiding and Abetting Fraud

          a.     Under New York law, there are four elements required to support a claim for aiding and abetting fraud: (1) the existence of a fraud, (2) the defendant's knowledge of the fraud and (3) that the defendant provided substantial assistance to advance the fraud's commission and (4) damages (see King County v. IKB Deutsche Industriebank AG, 09 Civ. 8387).

       19.     Aiding and Abetting Another's Breach of Fiduciary Duty

          a.     To support a claim for aiding and abetting another's breach of fiduciary duty under New York law, the plaintiff must demonstrate that the defendant knowingly induced or participated in the breach (see Kaufman v. Cohen, 307 A.D.2d 113, [125], 760 N.Y.S.2d 157, 169 ([1st Dept]2003)).

       20.     Defamation

          a.     Under New York law, there are four elements that are generally required to support a claim for defamation: (1) a false statement concerning another person, (2) communication of that statement to a third person, (3) fault on the part of the person making the statement amounting to intent or at least negligence and (4) some harm caused to the person who is the subject of the statement.

          b.     In Dillon v. City of NY, 261 A.D.2d 34 (1999), 704 N.Y.S.2d 1, Justice Tom states, "Defamation has long been recognized to arise from the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society."

## III.    JURISDICTION AND VENUE

       21.     Pursuant to 28 U.S. § 1332, this Court has jurisdiction over the subject matter of this action.

       22.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2), (c) & (d), because defendants transact significant business within this district and therefore are subject to personal jurisdiction in this district and because a substantial part of the events giving rise to the claims alleged occurred in this district.

## IV.    PARTIES

23.     Plaintiffs Angelo Arena and Katrina Arena, husband and wife, are New Jersey residents.

24.     Defendant Jonak Inc. is a New York corporation with its principal place of business at 45 Crescent Hill Road, Pittsford, New York 14534.

25.     Defendant Frank DAngelo is a New York resident and resides at 45 Crescent Hill Road, Pittsford, New York 14534.

26.     Defendant Diane DAngelo is a New York resident and resides at 45 Crescent Hill Road, Pittsford, New York 14534.

27.     Defendant Nicholas DAngelo is a New York resident and resides at 1753 Jackson Road, Penfield, New York 14526.

28.     Defendant Thomas Solomon is a New York resident and resides at 400 West Metro Park, Rochester, New York 14623.

29.     Defendant Daniel Kubiak is a New York resident and resides at 400 West Metro Park, Rochester, New York 14623.

V.      **BACKGROUND**

30.     Mrs. Arena was a partner of Grandmar Assosicates Lp ("Grandmar") from 2004 through 2008. Grandmar was, and continues to be, operated by Nichoas DAngelo Sr. ("Nicholas Sr."). The account was a UTMA account with Mrs. Arena as the minor and Mr. DAngelo as the custodian.

31.     In 2008, Mrs. Arena sold her Grandmar ownership back to Grandmar for $100,000.00.

32.     Upon selling her interest back to Grandmar, The Arena's decided that Mrs. Arena should (1) pay off her student loans in their entirety, which equaled approximately $60,000.00 and (2) invest the remaining balance long-term into mutual funds that were appropriate for someone her age.

33.     Upon The Arena's discussing their intent with Mr. DAngelo, Mr. DAngelo made the claim that he could "earn more than the student loan interest rate and do it conservatively in a liquid account." Mr. DAngelo was referring to (1) pooling Mrs. Arena's monies, along with monies from her three siblings, and investing such monies with Karpus Investment Management ("Karpus"), located at 183 Sullys Trail, Pittsford, New York 14534. Mr. DAngelo went on to state that (1) all funds would be available upon request, (2) the account was "safe" and (3) pooling the money with Mrs. Arena's three siblings would offer a lower management fee of the assets, thereby increasing Mrs. Arena's return. Mr. DAngelo further

9

COMPLAINT

stated that he had a meeting with representatives from Karpus and they "impressed him."

34.     The Arena's concluded that Mrs. Arena would invest her $100,000.00 with Karpus and that if they were not happy with the performance, Mrs. Arena could withdrawal the funds at anytime, as promised by Mr. DAngelo, and implement their original plan of (1) paying off Mrs. Arena's student loans in their entirety and (2) investing the remaining balance long-term in mutual funds.

35.     It was determined that instead of putting the funds into any one individuals name, or joint for that matter, establishing an S corporation would be in the best interest of all parties. In doing so, it was decided that each party would deposit $100,000.00 and in exchange, each party would receive 25 shares, thereby each individual becoming a 25% shareholder. On January 08, 2008, Jonak was incorporated in New York State. Upon doing so, Mr. DAngelo was named CEO, each of the four shareholders provided Mr. DAngelo with their $100,000.00 (totaling $400,000.00) and The Arena's were told that the Karpus account was funded.

36.     In late 2008 and early 2009, Mr. DAngelo began a campaign of attempting to exert control over Mrs. Arena's adult life. In doing so, Mr. DAngelo attempted to control matters in Mrs. Arena's adult life such as (1) when she could get married, (2) where she could live geographically, (3) where she could attend her graduate education (Mr. DAngelo also attempted to tell Mr. Arena where he should attend law school and that "a law degree is a law degree and it doesn't matter where you attend." It is clear that Mr. DAngelo made this statement in an effort to have Mr. Arena stay closer to Rochester to enable his absolute control over Mrs. Arena. Knowing that this comment was made out of nothing more than ignorance, as Mr. DAngelo has never attained a college degree of any kind, let alone a Juris Doctor, Mr. Arena thanked Mr. DAngelo for the good laugh, but explained that (1) Mr. Arena believes in a quality education, (2) Mr. Arena will make an independent decision as to where he will attend law school and (3) offered Mr. DAngelo some wisdom: (a) control is not a relationship and (b) Mr. DAngelo should be happy for Mrs. Arena with whatever personal decisions that she makes and allow for her to prosper and grow in her own independent life, opposed to attempting to exert the bizarre control he sought), (4) what she could and could not study while attaining her education, (5) what she could and could not do with her adult life and (6) Mr. DAngelo made it a point to stress to Mrs. Arena that following her dreams was inappropriate and instead, she must listen to his commands. This bizarre attempt by Mr. DAngelo to exert abnormal

10

COMPLAINT

control over Mrs. Arena's adult life had a direct effect on Mr. Arena's life as a result of (1) The Arena's being in a romantic relationship since 2002 and (2) The Arena's having built their relationship with the intent of spending their entire lives with one another. Mr. DAngelo's constant harassment against Mrs. Arena turned abusive and Mr. DAngelo made it clear that he did not want to be a part of Mrs. Arena's life unless he could unequivocally exert his control over every aspect of her life. As a result of such abusive treatment and absurd demands, The Arena's decided that it was in their best interest to no longer associate themselves with Mr. DAngelo, while at the same time making it clear to Mr. DAngelo that they would like for him to be a part of their lives if he was willing to end his dictatorial desires, although this never occurred and it quickly became clear that Mr. DAngelo had a problem understanding that individuals are free and that individuals have individual rights and instead, he had disturbing desires to control others. In early 2009, Mrs. Arena moved in with Mr. Arena and Mr. Arena began to financially support Mrs. Arena.

37.    In early 2010 and during The Arena's last semester of their undergraduate education, The Arena's decided that they would move to Florida in May 2010. As a result, Mrs. Arena went back to Mr. DAngelo's home to collect her belongings, of which resulted in Mr. Arena having to call 911 after Mr. DAngelo physically attempted to kidnap her and steal her belongings. Subsequent to this, Mr. DAngelo repeatedly contacted Mrs. Arena prior to The Arena's moving to Florida stating, "You need to come alone with me to my attorney's office to take care of something and if you don't, you are going to get into a lot of trouble." Mr. DAngelo never specified what the "something" was, but regardless, Mr. Arena advised against it, as The Arena's knew that Mr. DAngelo was clearly attempting to coerce Mrs. Arena into giving her complete interest in Jonak to him.

38.    The Arena's moved to Florida in May 2010 and severed all personal communication with Mr. DAngelo, excluding contacting him for Mrs. Arena's interest in Jonak.

39.    The Arena's married in 2011.

40.    In late 2010 and through late 2011, Mrs. Arena attempted to contact Mr. DAngelo to receive (1) her Schedule K-1's from Jonak, (2) the annual balance sheet for Jonak and (3) liquidate her ownership in Jonak. Mr. DAngelo made claims that "I am mailing the documents today and they should be there shortly," but Mrs. Arena was unsuccessful in her attempts and never received any requested documents. On many occasions, Mr. DAngelo stated to Mrs. Arena, "If you want your money, you need to

11

COMPLAINT

come to Rochester alone to get it and that is the law." Mrs. Arena disagreed, as this was a false and deceptive assertion, and continued to attempt to have her rights upheld. It is clear that Mr. DAngelo's intent was to get Mrs. Arena alone and attempt to threaten and coerce her into giving her interest in Jonak to Mr. DAngelo, as he had previously attempted to do.

41.    In September 2011, The Arena's requested tax transcripts and in doing so, they discovered that Mr. DAngelo had fraudulently filed Mrs. Arena's 2009 Federal and New York State tax returns and did so on September 15, 2010. Mrs. Arena was not legally required to file a 2009 tax return. Mr. Angelo filed the tax returns with his friend, Mr. Kubiak. Mr. Kubiak has been a registered Certified Public Accountant in New York State since March 22, 1972 and therefore, practicing for over 42 years. On the fraudulently filed 2009 tax returns filed by Mr. DAngelo and Mr. Kubiak, the following information was listed: (1) Mr. DAngelo's personal contact information in place of Mrs. Arena's, (2) false tax schedules to benefit Mr. DAngelo's tax status and (3) Mr. Kubiak listed as a "Third Party Designee," granting himself power of attorney privileges over Mrs. Arena's tax returns (specifically, the question reads, "Do you want to allow another person to discuss this return with the IRS?"). It is clear that Mr. DAngelo filed Mrs. Arena's tax returns for two reasons: (1) as an attempt to exert his control over Mrs. Arena's adult life and (2) to financially gain on his personal income tax return (Mrs. Arena amended the fraudulently filed tax returns using accurate information and as a result, it was concluded that she was due a refund from both the IRS and New York State). The tax returns included Schedule K-1 income from Jonak, where Mrs. Arena earned $2,963.00 (included interest income of $4,114.00 and ordinary income of ($1,151.00)). Mrs. Arena has never been paid this income. It is clear that another motivation behind fraudulently filing Mrs. Arena's tax returns was to conceal the Schedule K-1 income, along with additional income from her UTMA accounts, of which she has never received.

42.    In September 2011, The Arena's further discovered that on April 18, 2011, Mr. Kubiak fraudulently filed Form IT-370 (Application for automatic six-month extension of time to file for individuals) with New York State, which only demonstrates the intent of Mr. Kubiak and Mr. DAngelo to continue to fraudulently file Mrs. Arena's tax returns. It is important to note that (1) Mrs. Arena filed her 2010 federal tax return in late January 2011 (nearly three months prior to when Mr. Kubiak fraudulently filed Form IT-370) and (2) Mrs. Arena was not required to file a New York State tax return in 2010. The

12

COMPLAINT

extreme and outrageous misuse of Mrs. Arena's most personal and sensitive information by Mr. Kubiak and Mr. DAngelo set the expectation for New York State that they would be receiving a personal tax return from Mrs. Arena in 2010, of which was false and only created confusion and demonstrates the deliberate mishandling of Mrs. Arena's most personal and sensitive information without her consent.

43.     Mrs. Arena immediately contacted Mr. Kubiak to recover a copy of her tax return and to make it clear that Mr. Kubiak does not have her permission, nor did he ever have her permission, to file her tax returns. Mr. Kubiak refused to provide Mrs. Arena with a copy of her tax returns and abruptly hung up the telephone on her. Mrs. Arena attempted to contact Mr. Kubiak for over two weeks, but failed to receive a response. As a result, The Arena's contacted the office of the New York State Assistant Attorney General and communicated with Debra Martin, whom personally called Mr. Kubiak and forced him to provide Mrs. Arena with her tax returns. Although Mr. Kubiak delivered the tax returns to Mrs. Arena in a timely manner, Mr. Kubiak refused to furnish Mrs. Arena with the HSBC Form 1099 used to fraudulently file her 2009 tax returns, which was later discovered to be an UTMA account where Ms. DAngelo was the custodian and Mrs. Arena was the minor. Mr. Kubiak was knowingly concealing the HSBC Form 1099 in an attempt to prevent Mrs. Arena from discovering pertinent information regarding the account and therefore, substantially aiding and abetting Ms. DAngelo in not following her fiduciary duty under standard UTMA procedure and further, committing fraud. This only demonstrates the desire sought by Mr. DAngelo and Mr. Kubiak to exert control over Mrs. Arena's most personal and sensitive matters and do so in an oppressive and fraudulent manner. Mr. Kubiak knowingly and directly participated in the fraud, which is demonstrated by the bad faith manner in which he dealt with Mrs. Arena's request for her tax returns, of which she has a legal right to pursuant to § 29.10(a)(8) of the New York State Board of Regents, which is governed by § 6509 of the New York State Education law. Additionally, Mr. Kubiak failed to adhere to many other New York State statutes as outlined in Title 8 of the New York State Education law.

44.     In a letter dated August 03, 2011 and delivered August 06, 2011 at 10:17 AM to Jonak Inc. (Attn: Frank DAngelo) at the address of record for Jonak, PO Box 449, Pittsford, New York 14534, Mrs. Arena requested the annual balance sheet and profit and loss statement for Jonak pursuant to § 624(e) of the New York Business Corporation law. In doing so, Mrs. Arena copied and pasted § 624(e) of the

13

COMPLAINT

New York Business Corporation law into the letter, which makes it clear that upon request of any shareholder, the annual balance sheet and profit and loss statement must be mailed to the said shareholder. Mrs Arena explicitly stated her address to which the documents should be mailed and explicitly encouraged Mr. DAngelo to act in good faith.

45.    In a letter dated August 06, 2011, but received on September 12, 2011, Mr. Solomon, the attorney representing Mr. DAngelo and Jonak, responded to Mrs. Arena's letter dated August 03, 2011. In the letter, Mr. Solomon stated, "There is no problem giving you this information but he (Mr. DAngelo) wanted to know that you signed the letter as he believes the signature on the letter is not yours." Mr. Solomon then requested Mrs. Arena's notarized signature and stated, "the information you requested will be available after September 15th and I will send it to you when I receive your signed letter. Dan (Mr. Kubiak) wanted me to tell you that he will not prepare anymore of your tax returns but the information I will be sending you will allow you to file your 2010 tax returns." In writing this, Mr. Solomon admits that (1) Mr. Kubiak did not have Mrs. Arena's permission to file her 2009 tax returns and (2) Mrs. Arena cannot file a completed 2010 tax return without her Schedule K-1. Additionally, Mr. Solomon deceptively attempted to use an ill family member in an attempt, once again, to coerce Mrs. Arena into coming to Rochester, New York with the intent of getting her alone to threaten and coerce her into giving her interest in Jonak to Mr. DAngelo. In fact, Mr. Solomon and Mr. DAngelo had tried so many times in the past to corner Mrs. Arena alone in an attempt to coerce her, that Mr. Solomon needed to explicitly state, "and please do not think that this is some kind of subterfuge to get you to Rochester," but it was exactly that. Regarding the notarized signature request, Mrs. Arena and Mr. DAngelo engaged in multiple telephone conversations that only involved her investment in Jonak and did so prior to Mrs. Arena mailing her August 03, 2011 letter to Mr. DAngelo. In such telephone calls, Mrs. Arena made her demands for specific documentation and the liquidation of her ownership in Jonak clear. With this said, and although a notarized signature is a bizarre request, not one required by law (§ 624(e) of the New York Business Corporation law does not state that a signature of any sort, let alone a notarized signature, is required), designed to be a burden for Mrs. Arena and an intrusive request, The Arena's decided that in the spirit of resolving the matter, Mrs. Arena would have her signature notarized. It is important to note that it is completely unreasonable to believe Mr. DAngelo's assertion that he believed some else signed the

14

COMPLAINT

document, especially after they engaged in multiple telephone conversations, or that someone would impersonate Mrs. Arena in an attempt to receive a Jonak balance sheet or a Schedule K-1 in Mrs. Arena's name. Further, it is important to note the casual and close relationship between Mr. Solomon and Mr. Kubiak (referred to as "Dan" by Mr. Solomon) and that both parties share an office at 400 West Metro Park, Rochester, New York 14623.

46.     In a letter dated September 15, 2011 and delivered September 17, 2011 at 9:50 AM to Jonak Inc. (Attn: Frank DAngelo) at the address of record for Jonak, PO Box 449, Pittsford, New York 14534, Mrs. Arena requested (1) the annual balance sheet and profit and loss statement for Jonak pursuant to § 624(e) of the New York Business Corporation law, (2) her Schedule K-1's and (3) the liquidation of all of her outstanding shares in Jonak at their current fair market value. The letter included Mrs. Arena's notarized signature and explicitly stated where to mail her documentation and check. Mrs. Arena's demands, where the documentation should be mailed and the notarized signature were all inclusive on one page. Again, Mrs. Arena encouraged Mr. DAngelo to act in good faith. Mrs. Arena did not receive the documentation promised by Mr. Solomon and Mr. DAngelo, nor did Mrs. Arena receive any response.

47.     In a letter dated October 03, 2011 and delivered October 05, 2011 at 9:32 AM to Jonak Inc. (Attn: Frank DAngelo) at the address of record for Jonak, PO Box 449, Pittsford, New York 14534, Mrs. Arena restated the demands made in her letter dated September 15, 2011 and expressed her deep dissatisfaction with the deception on behalf of Mr. DAngelo and Mr. Solomon, their oppression, the fraudulent filing of her 2009 tax returns and their failure to abide by New York State laws. Mrs. Arena did not receive the documentation promised by Mr. Solomon and Mr. DAngelo, nor did Mrs. Arena receive any response. The purpose of Mrs. Arena's notarized signature remains unknown, but it is clear that it was not used for the intended purpose.

48.     In response to the fraudulent filing of Mrs. Arena's tax returns and the failure on behalf of Mr. DAngelo to (1) provide Mrs. Arena with legally required documents, (2) provide Mrs. Arena with her K-1 income and (3) liquidate Mrs. Arena's Jonak shares as she had requested, and was promised to her from late 2010 through late 2011, The Arena's contacted the Monroe County Sheriff's Office in an effort to have the matter investigated. When The Arena's contacted the Monroe County Sheriff's Office, they informed the office: (1) Mr. DAngelo was being oppressive to Mrs. Arena, (2) Mr. DAngelo was refusing

15

to provide Mrs. Arena with legally required documentation regarding her investment in Jonak, (3) Jonak was not providing Mrs. Arena with her Schedule K-1 income, (4) Mr. DAngelo fraudulently filed Mrs. Arena's tax returns and (5) Mr. DAngelo was intentionally causing harm to the The Arena's.

49.   Although the Monroe County Sheriff's Office (1) did not listen to The Arena's issue, (2) misinterpreted the issues after several attempts by The Arena's to clarify such issues (either out of negligence or intentionally), (3) failed to investigate the issue, as a simple public records search would have proven that Mr. DAngelo was lying to the police and The Arena's claims had merit, (4) failed to conduct an independent and impartial investigation and (5) failed to allow The Arena's to rebut any of the misinterpretations that the police had made or any of the misinformation provided to the police by Mr. DAngelo or any other associated party in the police report, the statements that Mr. DAngelo did make in the police affidavit are substantially material and provide great insight into the deliberate manner in which Mr. DAngelo is willing to lie and his desire to deceive others. It is assumed that the Monroe County Sheriff's Office did not conduct an appropriate investigation as a result of The Arena's no longer being residents of New York State.

50.   In the police report dated November 21, 2011, it states, "Frank DAngelo advised me that Jonak Inc. inception was in 2008. He informed me that he has no ownership, nor does he receive any benefits from the company" and that "no money has been dispersed" (this statement is material, as it is later discovered that Mr. DAngelo was deliberately looting Jonak's capital to only satisfy his personal and financial needs at the expense of Mrs. Arena). If the Monroe County Sheriff's Office did any due diligence, they would have discovered this fraud through a simple public records search. The police report then states, "I then spoke with … Tom Sullivan. Sullivan stated that he is currently trying to work with Katrina to help her understand her role in Jonak Inc. He said that he will attempt to answer any of her questions, and add clarity to the situation for her." It is important to note that the police department did not even properly identify Mr. Solomon, as he was referred to Mr. Sullivan opposed to Mr. Solomon, and this only demonstrates the lack of an investigation conducted. Additionally, it is important to note that Mr. Solomon made these statements within two months after Mrs. Arena (1) accepted the undue burden of mailing her notarized signature to Jonak and (2) sent a duplicate demand letter for documentation that she has a legal right to. This demonstrates Mr. Solomon's (1) willingness to lie and deceive others, (2) desire

16

COMPLAINT

to control Mrs. Arena's personal matters and (3) direct involvement in the fraud and oppressive actions against Mrs. Arena. It is clear that Mr. Solomon was not currently trying to work with Mrs. Arena and the issue was never Mrs. Arena's lack of an understanding as to what her role was in Jonak. Instead, the issue was, and continues to be, the intentional and knowing fraud and oppression against Mrs. Arena by all defendants and in complete contradiction with law and normal business practices. No correspondence was mailed to Mrs. Arena following this and preceding this, the only correspondence mailed to Mrs. Arena was the letter dated August 06, 2011 from Mr. Solomon.

51.    Between early 2012 and June 2013, The Arena's submitted multiple complaints with various agencies, including the New York State Attorney General's Office, but nothing materialized as a result of the agencies inability to be the legal representative for Mrs. Arena.

52.    In July 2013, Mr. Arena began contacting various attorneys to seek to hire counsel in an attempt to recover documents related to Mrs. Arena's ownership in Jonak, of which Mrs. Arena has a legal right to.

53.    On August 21, 2013, The Arena's hired Jason Kiefer ("Mr. Kiefer"), an attorney employed by Boylan Code in Rochester, New York, to represent Mrs. Arena to recover documentation related to her ownership in Jonak, of which Mrs. Arena has a legal right to.

54.    In a letter dated September 03, 2013 and mailed to Jonak Inc. (Attn: Frank DAngelo) at PO Box 449, Pittsford, New York 14534 and 45 Crescent Hill Road, Pittsford, New York, 14534, Mr. Kiefer demanded the following: (1) all organizational documents of Jonak, (2) all minutes for the annual, regular, and special meetings of Jonak's Board of Directors and Shareholders, (3) all documents related to the purchase of Mrs. Arena's stock in Jonak, (4) all shareholder agreements, (5) all of Jonak's federal, state and local tax returns and all Schedule K-1's for Mrs. Arena since Jonak's incorporation and (6) all of Jonak's annual balance sheets, annual profit and loss statements, interim balance sheets and interim profit and loss statements since Jonak's incorporation. Mr. Kiefer requested the documentation be delivered to him no later than September 11, 2013. No response was received from Mr. DAngelo or any party representing Jonak.

55.    In a letter dated September 16, 2013 and mailed to Jonak Inc. (Attn: Frank DAngelo) at PO Box 449, Pittsford, New York 14534 and 45 Crescent Hill Road, Pittsford, New York, 14534, Mr. Kiefer

17

COMPLAINT

1    sent a duplicate letter of the one mailed on September 03, 2013.

2          56.    On September 18, 2013, Mr. Kiefer received an email from Mr. Solomon. In the email, Mr.

3    Solomon states, " Frank DAngelo just called to tell me that he received another letter from you asking for

4    corporate papers for Jonak Inc.," admitting to disregarding the first letter. Mr. Solomon then states, "I last

5    talked to your client four years ago and told her that if she came to my office I would give her all the

6    documents she requested and I never heard back from her. We do not have an address for Katrina nor a

7    phone number so the company has not been able to send her any notices of the shareholders and directors

8    meetings." Based upon clear facts, this is a deceptive and purely false statement. It was less than two years

9    ago that Mrs. Arena and Mr. Solomon engaged in written communication, Mr. Solomon was fully aware

10   of Mrs. Arena's contact information and Mr. Solomon made it clear that he would mail the documents

11   requested after receiving Mrs. Arena's notarized signature (which was an unreasonable burden placed

12   upon Mrs. Arena but, a burden that she completed). This was nothing more than another attempt by Mr.

13   Solomon and Mr. DAngelo to get Mrs. Arena alone to coerce her into giving her ownership in Jonak to

14   Mr. DAngelo. Additionally, Jonak is required to mail Mrs. Arena her Schedule K-1's annually and do so

15   without her request, which has never occurred. With this said, the vast lies and contradictions made by Mr.

16   Solomon makes his knowing intent to further the fraud and oppression by Mr. DAngelo and Jonak clear.

17   Mr. Solomon continues in the email by stating, "As you can see we have no dispute here as to Katrina's

18   right to have the documents, we only need to resolve the logistics. When I told Katrina that she needed to

19   come here to get the papers I told her that I would not let her family know that she was coming and that

20   will be true again for her anticipated visit." This was a bizarre comment, as (1) Mrs. Arena never verbally

21   spoke to Mr. Solomon, (2) Mrs. Arena communicated clearly to Mr. DAngelo that she would not travel

22   thousands of miles to receive documentation that she is legally required to mail to her, (3) the only

23   logistics to figure out is finding the closest post office to mail the documents from, (4) Mrs. Arena does

24   not care who knows if she visits Rochester, New York and finds it concerning that Mr. Solomon has gone

25   to such extremes to deceive her (maybe because he knows about Mr. DAngelo's attempt to kidnap Mrs.

26   Arena and steal her belongings in early 2010) and (5) the requests of Mr. Solomon and Mr. DAngelo are

27   nothing more than deceptive ploys designed to stall Mrs. Arena in an attempt to advance their coercive

28   alternative motives. This bizarre hide and seek game only being played by Mr. Solomon and Mr. DAngelo

18

COMPLAINT

serves the same purpose it had served since 2010: to get Mrs. Arena alone and coerce her into giving her ownership in Jonak to Mr. DAngelo through threats and intimidation. They have made their intent clear throughout their extremely oppressive conduct.

57.     In the same email from Mr. Solomon dated September 18, 2013, Mr. Solomon engaged in defamation against The Arena's. In particular, Mr Solomon stated, "I suspect that Katrina will need money to make the trip and I will get…(Mr. DAngelo)…to give her the money to do that." First, Mr. Solomon was the only party to say anything regarding Mrs. Arena traveling to Rochester, New York to receive documentation, of which Mr. Kiefer could have picked up, but more importantly, and consistent with normal business practices, Mr. Solomon could have, and should have, mailed the documentation to Mr. Kiefer or Mrs. Arena, thereby making any conversation regarding travel expenses irrelevant and unwarranted. Second, the purpose of making this defamatory comment was solely intended to (1) harm The Arena's by implying that Mr. Solomon, whom The Arena's have never met, let alone spoke to on the telephone, knew something about The Arena's financial condition, of which he did not, (2) inflict harm upon The Arena's reputation by setting the false expectation and creating the false perception that The Arena's had a disadvantaged financial standing or ability, (3) intentionally bloating the perception of Mr. DAngelo's financial condition and (4) patronize The Arena's. Further, Mr. Solomon made such comments after being an attorney for over 47 years and therefore on the surface appearing as a trustworthy source, but clearly abusing this privilege. The standard should only be higher for an individual in a position like Mr. Solomon, especially when comments are made against a private citizen, when Mr. Solomon has no knowledge of The Arena's finances and when Mr. Solomon was fully aware of the facts in the case. It is ironic, as Mr. Solomon could not be more contradictory. The issue at hand is (1) Mr. DAngelo's diversion of Jonak's assets for his personal use, whereby taking from Mrs. Arena to supplement his luxurious life, of which Mr. DAngelo would not have without Mrs. Arena's monies, and (2) the oppressive conduct on behalf of Mr. DAngelo and Jonak against Mrs. Arena. Mr. Solomon's desire to defame The Arena's demonstrates the high degree of his direct involvement in the oppressive actions against Mrs. Arena and his planning with Mr. DAngelo to commit fraud.

58.     On September 20, 2013, Mr. Kiefer engaged in a telephone conversation with Mr. Solomon, in which Mr. Kiefer restated Mrs. Arena's demands and Mr. Solomon continued to be

19

COMPLAINT

oppressive. Additionally, Mr. Kiefer was illegally denied an inspection of Jonak's records as allowed pursuant to New York Business Corporation Law § 624(b) and § 718(a).

59.     On September 24, 2013, Mr. Kiefer sent an email to Mr. Solomon, which sums the matter up well. In the email, Mr. Kiefer stated, "I know your client (Mr. DAngelo) expressed some concern that the request in my Letters was not being made at Katrina's direction, but as I told you, I have a signed engagement Letter from Katrina and that is sufficient indication that the request in my Letters was in fact being made at Katrina's direction. Furthermore, I know you mentioned that the Company (Jonak) would pay for Katrina's travel expenses to come to your office in Rochester to pick up the Company (Jonak) documents and records that we have requested or that you would come to my office to release them to me if I video conference her in so you could see her, but those additional conditions and burdens that the Company (Jonak) is trying to put on my client so she can obtain the Company (Jonak) documents and records that she is entitled to receive pursuant to law are not required by law, are another attempt to control my client, and to be very candid, are down right disturbing." Mr. Kiefer went on to say that it was his hope that Jonak would provide the documents to Mrs. Arena and that if they did not, Mrs. Arena would commence litigation. No response was received and no documentation was received. It is clear that all of these oppressive burdens amount to nothing more than an attempt to exert control and to further the stalling tactic on behalf of Mr. Solomon and Mr. DAngelo to carry out their fraud. Additionally, it is worth noting the vast contradictions Mr. Solomon makes. In particular, Mr. Solomon first states that he will not tell Mr. DAngelo that Mrs. Arena will travel to Rochester, New York and then in the next sentence, he states that he will have Mr. DAngelo pay for Mrs. Arena to travel to Rochester, New York. Although completely irrelevant, it is obvious that under the circumstances Mr. Solomon implies, he would have a duty to inform Mr. DAngelo that he is divulging Jonak's information and when and how he is doing it. Furthermore, as we have seen thus far, and we will continue to see, Mr. Solomon's statement that there is no dispute to Katrina's legal right to have the documents is nothing more than a lie. With this said, Mr. Solomon has once again demonstrated his deep involvement in the fraud and oppression against Mrs. Arena and his desire to deceive others.

60.     The Arena's paid Mr. Kiefer $540.00 for his services.

61.     In late 2013, The Arena's did a public records search on Jonak and revealed substantial

20

COMPLAINT

1     fraud. The following was discovered:

2                 a.     65 Allerton Street, Rochester, New York 14615

3                     i.     On February 06, 2008, Jonak entered into a mortgage agreement with

4     Leopold Schwaiger, where Jonak was the mortgagee and Leopold Schwaiger was the mortgagor.

5                    ii.     The loan-to-value ("LTV") was 59%, which was well below the standard

6     80% LTV and most common residential mortgage, FHA mortgage, LTV of 96.5%. The mortgage amount

7     was for $55,000.00 and the property was assessed by Monroe County for $92,700.00.

8                    iii.     The interest rate was 13% per annum and calculated daily.

9                    iv.     It was an interest only loan with an interest payment of $595.83 due per

10     month.

11                    v.     The loan was due in full on February 05, 2011, thereby making the term

12     three consecutive years.

13                    vi.     On June 06, 2008, Leopold Schwaiger satisfied the mortgage in full.

14                    vii.     Total interest paid to Jonak was $2,383.32.

15                    viii. Although this conduct by Jonak was far outside of the purpose that Jonak

16     was created for or why The Arena's decided to invest in Jonak, the loan had been satisfied.

17                 b.     5701 West Wautoma Beach Road, Hamlin, New York 14468

18                    i.     On June 23, 2008, Jonak entered into a mortgage agreement with Shaun

19     and Elicia Struble, where Jonak was the mortgagee and Shaun and Elicia Struble were the mortgagors.

20                    ii.     The LTV was 28%, which was well below the standard 80% LTV and most

21     common residential mortgage, FHA mortgage, LTV of 96.5%. The mortgage amount was for $32,000.00

22     and the property was assessed by Monroe County for $115,700.00.

23                    iii.     The interest rate was 11% per annum and calculated daily.

24                    iv.     It was an interest only loan with an interest payment of $304.74 due per

25     month.

26                    v.     The loan was due in full on June 20, 2011, thereby making the term three

27     consecutive years.

28                    vi.     On February 25, 2010, Shaun and Elicia Struble satisfied the mortgage in

COMPLAINT

1    full.

2                    vii.    Total interest paid to Jonak was $7,313.76.

3                    viii.   Although this conduct by Jonak was far outside of the purpose that Jonak

4    was created for or why The Arena's decided to invest in Jonak, the loan had been satisfied.

5            c.    45 Crescent Hill Road, Pittsford, New York 14534

6                    i.    On March 11, 2009, Jonak entered into a purchase agreement with Gerald

7    Krotter to purchase the residential property for $160,000.00 in cash.

8                    ii.    On February 17, 2010, a warranty deed was assigned from Jonak to Mr.

9    DAngelo and Ms. DAngelo. The sale price was $380,000.00. The parties involved in executing the

10   contract were (1) Mr. DAngelo, (2) Ms. DAngelo, (3) Nicholas and (4) Mr. Solomon. Nicholas was one of

11   the four initial shareholders in Jonak. On the warranty deed, the signature line for Jonak reads, "Nicholas

12   DAngelo" only and does not indicate an official title or what representative authority Nicholas bears or

13   has performed the signature using, except that Nicholas has signed the contract personally, whereby quite

14   possibly forging such authority, which would thereby make the contract void. Additionally, the notary

15   section of the page for Nicholas states that Nicholas executed the document in the capacity outlined,

16   which is personally in this contract, and that by Nicholas's signature on the instrument, he executed the

17   instrument in that capacity (the notary public was Mr. Solomon). Further, even if Nicholas had provided

18   an official title as to what representative capacity, if any, he was acting in, it would not preclude him from

19   liability under New York Business Corporation law § 720 and instead, it only creates additional liability

20   for Nicholas, of which to what extent is unknown until it is understood if Nicholas was an officer at the

21   time of signing this contract or if he had forged the signature. All that is clear is that the unambiguous

22   contract does not demonstrate that Nicholas signed the contract in an official capacity, but instead in a

23   personal capacity. Mrs. Arena would have been able to be more conclusive regarding the extent of this

24   liability if Jonak and/or Mr. DAngelo abided by Mr. Kiefer's legal request to inspect the records of the

25   corporation, specifically in accordance with New York Business Corporation law § 718, which would

26   have revealed if Nicholas was an officer. If Nicholas was an officer of Jonak with the ability to sign in a

27   representative manner and decided not to sign the contract displaying his official title in an attempt to be

28   illusive, whereby only adding to the oppressive behavior on behalf of Jonak and Mr. DAngelo, he (1)

22

COMPLAINT

1    created additional personal liability for himself in addition to his liability under New York Business

2    Corporation law § 720, (2) breached his fiduciary duty, (3) acted in bad faith and (4) only aided and

3    abetted Mr. DAngelo and Ms. DAngelo for whatever personal reasons and/or alternative benefits realized

4    by his misconduct. It is clear that as a result of Nicholas's misconduct, Mrs. Arena has suffered. Nicholas's

5    actions were reckless and caused detrimental harm to Mrs. Arena while substantially benefiting Mr.

6    DAngelo and Ms. DAngelo. To put it differently, if Nicholas had not signed the contract or agreed to

7    accept the dismal sale price of  $380,000.00 in exchange for the property that was assessed by Monroe

8    County for $455,000.00 and appraised by Zillow for $548,143.00, (1) the property would be an asset of

9    Jonak to date, allowing for a profit upon its sale or (2) the property would have been sold on the

10   marketplace for approximately $525,000.00 - $575,000.00, rendering a profit of $145,000.00 -

11   $195,000.00, of which now can be realized by Mr. DAngelo only, whom perpetrated the intentional fraud

12   against Mrs. Arena. This is a clear example of Mr. DAngelo profiting off the loss of Mrs. Arena.

13   Furthermore, a reasonable person acting in good faith would have chosen either alternative to the one

14   sought by Nicholas. It is clear that regardless as to if Nicholas (1) forged authority on behalf of Jonak that

15   he did not possess or (2) had the authority, but was acting illusive, negligent and in bad faith, he was a

16   party to the fraud as it is known that without his signature, Mr. DAngelo would not have been able to

17   perpetrate his fraud, thereby making Nicholas equally responsible. There are multiple contracts executed

18   on behalf of Jonak, but this is the only contract executed by Nicholas and this is the only contract that is

19   illusive as to the official title of the representative signing the document (all other documents contain the

20   following verbiage in the signature line: "Frank DAngelo, Pres.").

21                               iii.    On February 17, 2010, a mortgage was executed where the mortgagee was

22   Wells Fargo Bank, N.A. and the mortgagors were Mr. DAngelo and Ms. DAngelo. The mortgage was for

23   $300,000.00 and a term of 30 years. Mr. DAngelo and Ms. DAngelo again personally and financially

24   gained at the loss of Mrs. Arena, as the LTV calculated by Wells Fargo Bank, N.A. was substantially

25   below the average and therefore, it enabled Mr. DAngelo and Ms. DAngelo to receive an interest rate

26   substantially below what they would have received without committing fraud. Specifically, if Mr.

27   DAngelo and Ms. DAngelo purchased the property at its current fair market value of $550,000.00, they

28   would not have qualified for an FHA mortgage as a result of the sale price exceeding the maximum

23

COMPLAINT

1   allowable sale price under FHA rules and therefore, Mr. DAngelo and Ms. DAngelo would have been

2   required to pay $110,000.00 in cash to reach an 80% LTV. In their preferential situation, as a result of their

3   fraud, they purchased the property for vastly below the property value and at nearly a 50% LTV, thereby

4   substantially reducing the risk to Wells Fargo Bank, N.A. by acquiring the mortgage and ultimately

5   allowing for a lower interest rate than otherwise would have been granted. Additionally, Wells Fargo

6   Bank, N.A. is the reason that Mr. DAngelo needed Nicholas to perpetrate his fraud, as Wells Fargo Bank,

7   N.A. would not have granted the mortgage if Mr. DAngelo signed on behalf of Jonak without Mr.

8   DAngelo demonstrating that he owned 100% of Jonak, as anything less would indicate that Mr. DAngelo

9   was committing fraud, which he was, and personally and financially benefiting at the expense of others,

10  which he did. With the assistance of Nicholas, Mr. DAngelo concealed his fraud. If Mr. DAngelo signed

11  the warranty deed, there would have been suspicion on behalf of Wells Fargo Bank N.A. and therefore,

12  Mr. DAngelo, Nicholas and Mr. Solomon knowingly and intentionally devised a plan to conceal the fraud.

13  In future contracts where the parties are Mr. DAngelo, Jonak and Mr. Solomon only, this tactic is not used,

14  as there is no third party to criticize their dealings. This deliberate concealment and work around by Mr.

15  DAngelo only demonstrates his fraudulent intent that he only took steps to avoid being detected.

16           iv.    It is assumed that the remaining $80,000.00 of the $380,000.00 purchase

17  price was paid to Jonak from Mr. DAngelo and Ms. DAngelo in cash.

18           v.    To conclude, the following occurred: (1) Mr. DAngelo diverted $160,000.00

19  of Jonak's capital to purchase 45 Crescent Hill Road, Pittsford, New York 14534 with the sole intent of

20  purchasing the property back from Jonak after constructing a new luxurious home using additional capital

21  from Jonak, (2) Mr. DAngelo provided himself with an additional $220,000.00 ($380,000.00 -

22  $160,000.00) of Jonak's capital that was looted by Mr. DAngelo to commit his fraud and was done so at

23  an interest rate of 0% for approximately one year to construct his new luxurious home and (3) when Mr.

24  DAngelo was done building his new luxurious home using Mrs. Arena's money at a 0% interest rate, he

25  sold it to himself at a significantly below market price, thereby causing more harm to Mrs. Arena and

26  generating no profit for Mrs. Arena and instead, as we will see later, realizing losses for Mrs. Arena. It is

27  important to note that this occurred in 2009 during the worst recession since the Great Depression in the

28  early 1930's and that it was fueled by real estate, making it safe to say that it would have been impossible

24

COMPLAINT

1    for Mr. DAngelo to receive a construction loan from a bank and if he was able to receive a construction

2    loan, which is a big if, he would have been assessed an interest rate in excess of 15% and the allowable

3    borrowing wouldn't have been greater than $5,000.00 - $10,000.00, thereby disallowing Mr. DAngelo and

4    Ms. DAngelo from building their new luxurious home. With this said, Mr. DAngelo and Ms. DAngelo

5    should have saved their own monies instead of committing fraud. Furthermore, it is clear that Mr.

6    DAngelo has only used Mrs. Arena's money to personally and financially benefit himself while

7    deliberately causing harm to The Arena's life by denying them the ability to file complete tax returns and

8    the ability to liquidate Mrs. Arena's ownership in Jonak, among other detriments.

9                                vi.    Please note that on November 21, 2011, over one year after this fraud occur,

10   Mr. DAngelo stated in a police report that he personally receives no benefit from Jonak and that no money

11   has been dispersed. Thus far, Mr. DAngelo and Ms. DAngelo are the only parties receiving any benefit

12   from Jonak and this trend only continues and worsens.

13                        d.    2217 Penfield Road, Penfield, New York 14526

14                                i.    On January 19, 2007, Grandmar entered into a mortgage agreement with

15   Great Lakes Funding Corporation ("Great Lakes"), where Grandmar was the mortgagee and Great Lakes

16   was the mortgagor. The mortgage amount was $155,000.00 and the term was four consecutive years.

17                                ii.    On August 15, 2007, Roberts Capital Corporation ("Robert") entered into a

18   mortgage agreement with Great Lakes. The collateral was the property located at 2217 Penfield Road,

19   Penfield, New York 14526. The mortgage amount was $53,000.00. This brings the outstanding debt on the

20   property to $208,000.00. The property was assessed by Monroe County for $148,500.00 and therefore, the

21   LTV was 140%, which is substantially above the average. Further, it is not coincidental that (1) Mr.

22   Solomon was the attorney for the transaction and (2) it just happened that when Great Lakes needed to

23   borrow on a property that was already underwater, they conveniently happened to stumble upon Mr.

24   Solomon and Roberts, both longtime associates of Nicholas Sr., and it just so happened that Roberts

25   deeply desired to lend money that he was assured to never get back in the event of a foreclosure. Instead,

26   the facts point to this being an orchestrated event, as outlined below.

27                                iii.    On October 15, 2010 and in the Supreme Court of New York, County of

28   Monroe, Nicholas Sr. filed a notice of pendent mortgage foreclosure against Great Lakes and Roberts for

25

COMPLAINT

the collateral property located at 2217 Penfield Road, Penfield, New York 14526. The Attorney of record for Nicholas Sr. was Mr. Solomon.

iv.    On June 21, 2011, Nicholas Sr. assigned the mortgage made on January 19, 2007 to Jonak, where Grandmar was the mortgagee and Great Lakes was the mortgagor for the mortgage amount of $155,000.00, of which Nicholas Sr. had recently filed a notice of pendent mortgage foreclosure against. The transfer was for $153,000.00 in debt on a property assessed by Monroe County for $148,500.00 and therefore, the LTV was 103%, which is significantly above the average and this was done on a property that is pending foreclosure, where there are at a minimum legal expenses, but always the possibility of unforeseen legal issues and additional expenses, including intentional damages caused by the previous owner and natural damages that result from the property being unoccupied for significant periods of time, which is common. It is obvious there were clear alternative motives for Mr. DAngelo to make this transaction on behalf of Jonak and that the risks that would normally come with a foreclosure or absorbing any debt were not present in this matter and instead, the outcome was known before it occurred as a result of the entire matter being fabricated. A reasonable person would not have made this transaction and Mr. DAngelo clearly acted in bad faith in an attempt to satisfy all parties perverse needs, except for Mrs. Arena's legitimate needs, which is the only party that Mr. DAngelo had an obligation to meet the needs of. A reasonable person would have waited until the foreclosure was successful and bid on the property in the normal bidding process if the person desired the property and such a reasonable person would only bid a fair price for the property, taking into account probable intentional damages from the foreclosed upon owner and more importantly, the most common damages, which are damages caused by nature itself that are the result of the foreclosed upon property being unoccupied for a significant period of time.

v.    On November 15, 2011, the deed was transferred from Great Lakes and Rochester Capital Corporation ("Rochester") to Jonak. Rochester Capital Corporation is located at 400 West Metro Park, Rochester, New York 14623, the same location as Mr. Kubiak and Mr. Solomon. Rochester is operated by Peter Kolokouris ("Mr. Kolokouris"). On July 24, 1989, Mr. Kolokouris was charged by the SEC in the United States District Court, Western District of New York. The charges included multiple illegal practices, including deceptive practices. All of Mr. Kolokouris's assets were

26

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

frozen pending trial (see SEC v. Peter Kolokouris and North Atlantic Fisheries, Inc., Civil Action No. 89-0682-T, USDC WDNY). It is not clear how Rochester had the deed in its name prior to the transfer, as this is the first time that Rochester had been a party to any matter relating to this property. It is assumed that since Roberts was not involved in the deed transfer that Roberts and Rochester are one of the same, but this cannot be concluded. Regardless, Mr. Solomon (1) uses Grandmar and Nicholas Sr. interchangeably throughout the contracts and proceedings and (2) grants Rochester authority at random, both appearing illegal, as the original parties to the contracts are being changed. It is assumed that this is being done so that tax benefits can be realized by additional parties. It is important to point out that there has been decades of transactions between Mr. DAngelo, Nicholas Sr., Great Lakes, Roberts and Rochester, in which Mr. Solomon has consistently been the attorney for all parties and that all parties are interconnected either through family or business relationships. All parties are playing hot potato with mortgages. Such mortgages come with high interest rates and result in foreclosures, which appears to have the effect of tax incentives for all parties, while the events are all being fabricated and no money is ever exchanged, nor are any losses incurred. With regard to this situation, it appears that Great Lakes enjoyed the tax benefit of a high interest rate for many years while Grandmar, Nicholas Sr., Roberts and Rochester enjoyed the tax benefit of "losses" in foreclosure. It appears to be tax evasion. Furthermore, in this transaction, Mr. Solomon represented Nicholas Sr. in the foreclosure proceeding against Roberts, but then represented Roberts immediately proceeding this and had represented Roberts for decades prior to this matter. With this said, the parties file suits against each other with Mr. Solomon as the attorney for the plaintiff and then Mr. Solomon represents the defendant in the next contract and the cycle repeats itself. This fraud demonstrates the intent of the parties and further how Mrs. Arena's losses have come at the gain of others, that the fraud is being committed knowingly on behalf of all parties and the intent has always been for the parties to personally gain at the detriment of Mrs. Arena. Additionally, The Arena's are law abiding citizens whom have a deep desire to not be associated with any criminal behavior, but have been unsuccessful in severing the relationship as a result of the extreme oppression on behalf of the defendants.

     e.    1615 Scottsville Road, Rochester, New York 14624

             i.    On August 27, 2012, Mr. DAngelo incorporated Hoagie's Deli-Pizza Inc. ("Hoagie's") in New York State.

27

COMPLAINT

ii.   On May 31, 2013, Mr. DAngelo incorporated 1615 Scottsville Road Inc. ("1615") in New York State.

iii.   On May 31, 2013, Jonak entered into a purchase agreement with Holt Road Storage LP ("Holt Road") to purchase the property for $70,000.00 in cash (the property was assessed by Monroe County for $67,600.00). Holt Road is owned and operated by Nicholas Sr. (Holt Road had recently "foreclosed" on a mortgage for the property in the amount of $125,000.00 and with an interest rate of 13%, representing the same characteristics of an inflated LTV and high interest rate as seen in the 2217 Penfield Road property, whereby granting Nicholas Sr. a significant tax incentive for the "foreclosure" and the subsequent sale to Jonak ($125,000.00 - $70,000.00 = $55,000.00, of which Nicholas Sr. can use to offset his income and is substantial) while the individual foreclosed upon enjoys the several years of tax deductions for the high interest rate. As demonstrated with 2217 Penfield Road, it appears that this was fabricated, no money actually exchanged hands and no losses actually occurred and therefore, the mortgage "foreclosed" upon by Nicholas Sr. was not legitimate, but instead simply another mortgage intertwined within the web of fraud by the parties outlined in the dealings of 2217 Penfield Road. It is illogical and unreasonable, to say the least, that Nicholas Sr. would have lent $125,000.00 on a property assessed by Monroe County for $67,600.00, representing a 185% LTV.

iv.   The LTV in the sale from Holt Road to Jonak was 104%, which is significantly above the standard LTV and is based upon the Monroe County assessment of $67,600.00 from when the property was purchased. Again, Mr. DAngelo had alternative motives when engaging in the transaction: (1) to complete the cycle for Nicholas Sr. by allowing for him to take a significant tax incentive for the "foreclosure" that proceeded the sale to Jonak and (2) satisfy the needs of Mr. DAngelo and Ms. DAngelo by using Jonak's capital as their personal piggy bank and doing so at the expense of Mrs. Arena.

v.   On August 09, 2013, Jonak entered into a mortgage agreement with 1615, where Jonak was the mortgagee and 1615 was the mortgagor. The mortgage amount was for $101,000.00. Mr. DAngelo signed as President of both 1615 and Jonak, where Mr. Solomon was the attorney for both 1615 and Jonak and Mr. Solomon was the notary public for the transaction.

vi.   The LTV was 149%, which was substantially above the standard LTV and

28

COMPLAINT

1    based upon the Monroe County assessment of $67,600.00 (the property is zoned as a commercial property

2    per Monroe County records). According to 12 CFR 365, under the authority of 12 U.S.C. 1828(o), the

3    FDIC makes it clear that the maximum LTV for commercial real estate should not exceed 80% and that is

4    after implementing prudent underwriting standards that are clear and measurable, which clearly did not

5    occur here.

6                               vii.    The interest rate was 4% per annum.

7                               viii.   The loan is due in full on June 01, 2043, thereby making the term thirty

8    years.

9                               ix.     According to Freddie Mac, in August 2013 the average residential mortgage

10   thirty year fixed rate mortgage, like the one made to 1615 from Jonak, was 4.46% with 0.7 point (making

11   it more expensive than the stated 4.46%).

12                              x.      According to New York State, the borrowing costs for its general obligations

13   was approximately 5.00% - 5.50%. Municipal bonds provide significant tax incentives for the lenders,

14   whereby making it more enticing and making the actual interest rate earned substantially higher than the

15   stated 5.00% - 5.50%.

16                              xi.     According to the United States Department of the Treasury, in August 2013

17   the average 30 year treasury yield was 3.90%.

18                              xii.    With this said, Mr. DAngelo wrote himself a $101,000.00 check from Jonak

19   to 1615 (1) on a property with an LTV of 149%, (2) at a 30 year fixed interest rate similar to what the

20   United States of America pays to borrow money and (3) after Mr. DAngelo purchased the property from

21   Nicholas Sr. approximately two months prior for $70,00.00, which was an inflated price in itself (this

22   implies that the property price increased 44% in approximately two months). It is highly improbable that

23   there is mortgage insurance on the note, as no insurer would insure against such substantial risk. It is

24   standard practice for lenders to protect themselves with mortgage insurance and this only represents

25   another example of how Mr. DAngelo is financially and personally gaining at Mrs. Arena's loss. Mr.

26   DAngelo used the $101,000.00 to construct his new luxurious business on the property, which included

27   elaborate restaurant equipment that is clearly not standard equipment, but instead ostentatious and more

28   costly than normal. The loan made to 1615 from Jonak is not guaranteed by Mr. DAngelo personally and

it is obvious that 1615 had no credit history or income tax returns to prove income. More specifically, Hoagie's was incorporated approximately one year prior to 1615 and therefore, the only intended purpose of 1615 was to serve as a conduit to funnel the $101,000.00 of capital from Jonak to Hoagie's. Mr. DAngelo incorporated 1615 to preserve the assets of Hoagie's and himself in the event that Hoagie's is not successful in general, or at this specific location, as it is well known that small businesses have a extremely high failure rate and because of this, it is uncommon for any financial institution to engage in small business lending (if such lending is engaged in, prudent underwriting standards are a must, where at a minimum Mr. DAngelo would have been required to (1) co-sign for the loan and (2) demonstrate his ability to pay back the loan). It is important to note that even if Mr. DAngelo was able to get financing for the commercial property (only for the real estate itself and not for any business expenditures), he would have only been able to borrow $54,080.00 (80% LTV on the Monroe County assessment of $67,600.00) after (1) personally co-signing for the loan and (2) demonstrating his ability to pay back the loan. Additionally, it is well known that commercial interest rates are higher than those for residential and therefore, he would have most likely paid at a minimum between 7.00% and 9.00% with outstanding credit and meeting all prudent underwriting metrics. Mr. DAngelo would still need additional capital to (1) construct his new luxurious business, (2) purchase the elaborate equipment installed at the business and (3) all other business expenses. Such expenses would have to take the form of (1) cash or (2) a small business loan. With this said, Mr. DAngelo should have (1) saved his own money to engage in his risky business venture or (2) contacted the Small Business Administration to borrow through legitimate channels. Again, prudent underwriting standards would have been used by the Small Business Administration and at a minimum, Mr. DAngelo would have been required to (1) co-sign for the loan and (2) demonstrate his ability to pay back the loan. Mr. DAngelo did not (1) use his own capital or (2) borrow from the Small Business Administration because of his unwillingness to put his personal assets at risk and instead, he found it appropriate to commit fraud with Mrs. Arena's monies after years of Mrs. Arena explicitly making it clear to Mr. DAngelo that she demanded the liquidation of her ownership in Jonak and demanded specific corporate and tax documentation, of which she has a legal right to. All gains for Jonak are capped at 4% per year, which could have been acquired by purchasing a risk-free and highly liquid United States Treasury note or even better, a New York State General Obligation municipal bond, which

1    would have yielded significantly more than 4%, came with significant tax incentives, virtually risk-free

2    and highly liquid, but this did not happen and instead, Mrs. Arena incurred losses from Mr. DAngelo's

3    fraud and the vast opportunity costs associated with Mr. DAngelo's fraud, whereas the risk to the

4    downside for Mr. DAngelo is zero and the upside potential is becoming the next Subway, for example, and

5    making millions of dollars on the back of fraud committed against Mrs. Arena, of which Mr. DAngelo

6    would never have achieved without committing fraud against Mrs. Arena, establishing the clear and

7    deliberate detriment created against Mrs. Arena. Mr. DAngelo can maintain the assets of Hoagie's,

8    including the intellectual, reputational and physical (including equipment) value, while Jonak would be

9    forced to foreclose on 1615, which is nothing more than a shell company without any assets and therefore,

10   Jonak would be at a substantial loss. In the event of a foreclosure, it would be difficult to sell the property,

11   as it would require Jonak to find a substantially comparable business as the buyer, making the sale

12   susceptible to a lower sale price due to the constraints of it being a commercial property and built

13   specifically for a restaurant. In the event of a foreclosure on 1615, Mr. DAngelo can (1) file for the

14   bankruptcy of 1615 or (2) dissolve 1615. Mr. DAngelo has once again knowingly committed fraud by

15   using Jonak's capital to satisfy his personal needs through excessive and unconscionable risk to Jonak and

16   at the expense of Mrs. Arena. This fraud was knowingly orchestrated by Mr. DAngelo and Mr. Solomon.

17                              xii.   It is important to note that on May 31, 2013, Mr. DAngelo incorporated

18   1615 and purchased the property from Nicholas Sr., both events occurring with Mr. Solomon as the

19   attorney. On this date, it appears that all parties collaborated together as to their intent to carry out this

20   fraud. Additionally, on this date Nicholas Sr. could have (1) sold the property to Mr. DAngelo personally,

21   (2) sold the property to 1615, or (3) sold the property to Hoagie's. Instead, the parties went out of their

22   way to protect Mr. DAngelo, Nicholas Sr. and Hoagie's and put Mrs. Arena's capital at significant risk by

23   selling the property to Jonak, incorporating 1615 and then initiating a loan to 1615 (a shell company with

24   no assets) from Jonak.

25                              xiv.   On February 04, 2014, Mr. DAngelo and Ms. DAngelo applied for a liquor

26   license for Hoagie's. On July 17, 2014, the said liquor license became effective. It is assumed Ms.

27   DAngelo is a shareholder of Hoagie's, whereby making this the second transaction where fraud is

28   committed against Mrs. Arena and Ms. DAngelo is involved on the benefit side of the equation,

1

making her involvement in the fraud clear and therefore, making her just as responsible for it. Mr. DAngelo and Ms. DAngelo first committed fraud to build a new luxurious home and now they have committed fraud to build a new luxurious business, all at a significant detriment to Mrs. Arena.

xv.    Again, The Arena's are law abiding citizens whom have a deep desire to not be associated with this clear criminal behavior, but have been unsuccessful in severing the relationship as a result of the extreme oppression on behalf of the defendants.

62.    12 CFR 365, under the authority of 12 U.S.C. 1828(o), created underwriting standards for real estate and states: (1) "Underwriting Standards: Prudently underwritten real estate loans should reflect all relevant credit factors, including: (a) the capacity of the borrower, or income from the underlying property, to adequately service the debt, (b) the value of the mortgaged property, (c) the overall creditworthiness of the borrower, (d) the level of equity invested in the property, (e) any secondary sources of repayment and (f) any additional collateral or credit enhancements (such as guarantees, mortgage insurance or takeout commitments)," (2) "The underwriting standards should address: (a) the maximum loan amount by type of property" (please note that there are approximately 15 more standards, of which were not included, as this was the most important for this matter) and (3) "Supervisory Loan-to-Value Limits: Institutions should establish their own internal loan-to-value limits for real estate loans. These internal limits should not exceed the following supervisory limits: Construction (Commercial, multifamily, and other non residential) = 80% LTV." These underwriting standards set the tone for what is standard when lending monies for any property, and specifies the FDIC Supervisory LTV Limit for commercial properties.

63.    It is important to contrast the mortgages made by Jonak to (1) Leopold Schwaiger and (2) Shaun and Elicia Struble and the mortgages made by Jonak to Mr. DAngelo. The mortgages made to (1) Leopold Schwaiger and (2) Shaun and Elicia Struble had (a) substantially below average LTV's and (b) substantially above average interest rates while the mortgages made by Jonak to Mr. DAngelo had (a) substantially above average LTV's, (b) substantially below average interest rates, including a 0% interest rate for the property located at 45 Crescent Hill Road, Pittsford, New York 14534, where Mr. DAngelo (1) borrowed $380,000.00 from Jonak at 0% for nearly one year (resulting in vast opportunity costs for Mrs. Arena) to construct a new luxurious home for himself and Ms. DAngelo and (2) then sold the property

32

COMPLAINT

back to himself at a substantially below market price with the assistance of Nicholas. This demonstrates that Mr. DAngelo understands how to implement reasonable underwriting standards, reasonable risk aversion and reasonable terms to uphold his fiduciary responsibility to Mrs. Arena when dealing with outside parties, although lending monies was never the intent of Jonak, but when it comes to benefiting himself, Mr. DAngelo intentionally ignores all reasonable underwriting standards, reasonable risk aversion and reasonable terms to uphold his fiduciary responsibility to Mrs. Arena. Instead, Mr. DAngelo has consistently gone out of his way to carry out his fraud, resulting only in benefits to his personal and financial needs, while intentionally ignoring that the monies are not his, but instead Mrs. Arena's. It is also important to note that Mr. DAngelo made the deliberate choice to continue to ignore that the monies are not his, but instead Mrs. Arena's, after multiple attempts by Mrs. Arena to liquidate her ownership in Jonak and receive documentation, of which she has a legal right to, over many years. Mr. DAngelo's desire to satisfy his self-interests above any legal obligation that he has to Mrs. Arena has been made abundantly clear.

64. On December 16, 2013, Mrs. Arena commenced litigation against Jonak in the Perinton, New York Small Claims Court. The claim was for "Attorney fee and tax penalty resulting from Jonak Inc. failing to provide me (Mrs. Arena), a 25% shareholder, with legally required tax and corporation documents." The claim was for $1,016.52, which included the $540.00 attorney fee paid to Mr. Kiefer and estimated tax penalties based upon income derived from Mrs. Arena's 2009 Schedule K-1 that was fraudulently filed by Mr. Kubiak and Mr. DAngelo. The matter was assigned to Justice Thomas Klonick, Small Claims Judge for Perinton Town Court ("Mr. Klonick"). The matter was scheduled to be heard on January 28, 2014. The court fee was $25.00.

65. On December 31, 2013, Mrs. Arena submitted a subpoena request for the following documents: (1) all organizational documents for Jonak, (2) all minutes for the annual, regular and special meetings of Jonak's board of directors and shareholders, (3) all documents related to the purchase of Katrina Arena's stock in Jonak, (4) all shareholder agreements, restricted stock agreements and other similar agreements executed by Jonak's shareholders, (5) all of Jonak's federal, state and local tax returns since incorporation, (6) all of Katrina Arena's Schedule K-1's from Jonak since incorporation, (7) all of Jonak's annual balance sheets, annual profit and loss statements, interim balance sheets and interim profit

33

COMPLAINT

1

and loss statements since incorporation, (8) all of Jonak's bank account statements since incorporation and

2

(9) all of Jonak's investment/brokerage account statements since incorporation. Mrs. Arena also included a

3

personal letter explaining the oppressive actions against her by Jonak, Mr. DAngelo and Mr. Solomon.

4

66.    On January 10, 2014, Mr. Klonick issued a Judicial Subpoena Duces Tecum for the

5

following documentation: (1) all organizational documents for Jonak, (2) all minutes for the annual,

6

regular and special meetings of Jonak's board of directors and shareholders, (3) all documents related to

7

the purchase of Katrina Arena's stock in Jonak, (4) all shareholder agreements, restricted stock agreements

8

and other similar agreements executed by Jonak's shareholders and (5) all of Katrina Arena's Schedule

9

K-1's from Jonak since incorporation. Mrs. Arena contacted the Perinton Town Court to inquire as to why

10

Mr. Klonick had not ordered Jonak to provide all balance sheets and annual profit and loss statements,

11

considering Mrs. Arena was entitled to receive such documents upon written request to Jonak under New

12

York State Business Corporation Law § 718(a) and therefore without a subpoena. The Court only stated

13

to Mrs. Arena that Mr. Klonick would not order Jonak to provide such documents. It is also important to

14

note that Mr. Klonick practices law as an attorney in addition to being the Small Claims Court Justice at

15

the Perinton Town Court and that as a private attorney, Mr. Klonick practices business law, which implies

16

that Mr. Klonick was aware of New York State Business Corporation Law § 718(a), but decided to

17

disregard it.

18

67.    On January 16, 2014, Mr. DAngelo was served the Judicial Subpoena Duces Tecum

19

ordered by Mr. Klonick. The Arena's spent $100.00 to have Mr. DAngelo served with the Judicial

20

Subpoena Duces Tecum.

21

68.    On January 17, 2014, Mr. Solomon sent a letter to Mr. Klonick, which included, among

22

other items, (1) a motion to quash the subpoena (please note the subpoena was for documentation that

23

Mrs. Arena has a legal right to), (2) a demand that Mrs. Arena pay for the "traveling expenses" for Mr.

24

DAngelo (please note that Mr. DAngelo's new and luxurious home that he built with Mrs. Arena's monies

25

is less than one mile away from the Perinton Town Court and that The Arena's had to take off an entire

26

day from work to travel 14 hours and 700 miles in the middle of winter), (3) a demand that Mrs. Arena

27

pay for a "one day witness fee" for Mr. DAngelo (please note that Mr. Solomon is confused regarding the

28

basics of civil procedure, as a Judicial Subpoena Duces Tecum is for documentation and there is no

34

COMPLAINT

1   witness fee, as the documents do not get paid for appearing. Additionally, Mr. DAngelo is not a witness,
2   but instead the defendant and defendants do not get paid for appearing as (1) they don't have to appear and
3   (2) defendants are being litigated against because the plaintiff has made a complaint against them as a
4   result of the defendant violating the plaintiffs rights), (4) a $3,000.00 counterclaim for "Jonak to be
5   reimbursed for its expenses in dealing with Katrina request for these documents" (this truly illustrates the
6   character and intent of Mr. DAngelo and Mr. Solomon. Mrs. Arena filed a claim for $1,016.52 and for
7   legitimate expenses that Mrs. Arena should not have incurred and Mr. DAngelo and Mr. Solomon decided
8   to counterclaim Mrs. Arena for $3,000.00 (the maximum allowable under law) because a subpoena was
9   issued requesting documentation that she has a legal right to as a result of Jonak's failure to provide
10  documents that Jonak is legally required to provide to Mrs. Arena at no fee. This demonstrates that Mr.
11  Solomon and Mr. DAngelo never intended to provide Mrs. Arena with any documentation, but instead it
12  was always a deceptive ploy to get Mrs. Arena alone to threaten and coerce her into giving her Jonak
13  ownership to Mr. DAngelo. Mr. DAngelo and Mr. Solomon were angry that they were being ordered to
14  provide documentation, they wanted to retaliate against Mrs. Arena for her attempting to gain control over
15  her personal matters and attempt to continue their control through intimidation of a counterclaim for
16  documents that Mrs. Arena has a legal right to. Additionally, it is contradictory that Mr. Solomon and Mr.
17  DAngelo were so willing to pay for Mrs. Arena to travel to Mr. Solomon's office to receive the requested
18  "documents," but when Mr. DAngelo and Mr. Solomon received a subpoena to actually produce the
19  documents requested by Mrs. Arena, it all of a sudden costs $3,000.00 to produce such documents. The
20  truth is clear and consistent with the facts, the intent of Mr. Solomon and Mr. DAngelo was never to have
21  Mrs. Arena to come to Mr. Solomon's office to receive any documents, but instead wanted to get Mrs.
22  Arena alone to threaten her and coerce her into giving her Jonak ownership to Mr. DAngelo)" and (5) to
23  engage in defamation against Mr. Arena, which is outlined below. Mr. Solomon's actual statements are as
24  follows: "The purpose of this letter is to act as a motion to quash the subpoena under 2304 of the CPLR
25  which requires such motion to be made promptly. Since I am not aware that the small claims division has
26  a motion term the court staff suggested that I write this request to you in the form of a letter and send a
27  copy to Katrina. Also my client was not given the required traveling expenses or one day witness fee
28  required to be given with the subpoena under 2303 of the CPLR. I cannot find where this fee is waived in

1   Small Claims Court." Mr. Solomon then went on to discuss his conversation with Mr. Kiefer by stating, "I
2   called Mr. Kiefer and told him that my client had no objection to Katrina having these documents but he
3   wanted to make sure that they were given directly to her and that he was willing to pay for her to come to
4   Rochester to get them. Katrina did not agree to that. In fact we had a similar go around on this issue in
5   September of 2011." Furthermore, Mr. Solomon discussed Jonak's formation and the $3,000.00
6   counterclaim for Katrina requesting documentation that she has a legal right to by stating, "For the record
7   Jonak is a close family corporation formed by Katrina and her two brothers and younger sister each
8   owning 25%. The company was funded from the liquidation of a limited partnership that their grandfather
9   (Nicholas Sr.) had set up for them. My client has interposed a counterclaim (for $3,000.00) here
10  requesting that Jonak be reimbursed for its expenses in dealing with Katrina request for these documents."
11  Mr. Solomon then engaged in defamation against Mr. Arena in the following statement: "The underlying
12  problem here is the relationship between Katrina's husband Angelo Arena and Katrina's family which I do
13  wish to get into here as I do not feel that their disagreements are relevant to deciding this matter. The
14  result of the disagreement, with out assessing fault, has unfortunately led to Katrina leaving her family and
15  having almost no contact with them." First, there is no relationship between The Arena's and Mr.
16  DAngelo, nor has there been a relationship for over 6 years. Second, the only party pondering this issue is
17  Mr. DAngelo, as it is disturbingly detrimental to his life that he attempts to exert his extreme and absolute
18  control over Mrs. Arena's personal and adult life, which has reached bizarre heights. Third, The Arena's
19  have long moved on from attempting to have a relationship with Mr. DAngelo. The Arena's only seek
20  peace in their lives by liquidating Mrs. Arena's ownership in Jonak and never having to deal with Mr.
21  DAngelo again. Fourth, Mrs. Arena is a member of one family and one family only and that is her family
22  with Mr. Arena and it has been this way for over 6 years. The defendants need to focus on the legalities of
23  the matter opposed to the subjective excuses, lies and sob stories that the defendants are the only parties
24  participating in. The Arena's are participating in the factual and realistic story, which demonstrates that the
25  defendants knowingly intended to commit fraud and oppressive actions against Mrs. Arena. It is disturbing
26  that Mr. DAngelo continues to long for his ability to exert his extreme and bizarre control over Mrs.
27  Arena's adult life, as he had sought six years ago when Mrs. Arena made the decision to move in with Mr.
28  Arena. There is nothing ambiguous about this and Mr. DAngelo simply needs to realize that Mrs. Arena is

36

COMPLAINT

an individual, she has individual rights and she will not be controlled by him, nor by anyone for that matter. Additionally, Mr. DAngelo needs to comprehend that Mrs. Arena's personal affairs are just that and they have nothing to do with him and to avoid further legal actions, it is recommended that Mr. DAngelo leave Mrs. Arena's personal information alone and her life to her to decide, as anything shy of this is a serious breach of her privacy and rights. Although Mr. DAngelo has demonstrated his difficulty in comprehending any of this, which is disturbing to say the least, he will need to learn that it is not normal to act in the manner he sought to act in six years ago and clearly seeks to act in today. Furthermore, the comment that this "has unfortunately led to Katrina leaving her family and having almost no contact with them" serves one purpose and one purpose only: to create a sob story in an attempt to (1) distract from the issue and facts, (2) distract from the oppressive conduct against Mrs. Arena and the fraud being committed by all defendants and (3) shift fabricated blame towards Mr. Arena for a matter that was the result of Mr. DAngelo attempting to exert extreme, bizarre and absolute control over Mrs. Arena's personal and adult life, which is not what a reasonable parent would do and is shocking to the conscience. This was an intentional attempt on behalf of Mr. Solomon to damage Mr. Arena's reputation and attack Mr. Arena's character to a third party. It is important to note that Mr. Arena was not a party to the proceeding nor previously mentioned in it. It is important to note that Mr. Solomon spelled out Mr. Arena's entire name, which demonstrates his intent to attack only Mr. Arena. Instead of distracting from the issues by committing defamation, when in reality there is vast oppression and fraud being committed by the defendants, the defendants should have simply followed the law and this matter would have been resolved many years ago. The attack on Mr. Arena's character and reputation by Mr. Solomon was unwarranted, irrelevant and simply another attempt to deceive others, deflect blame and stall Mrs. Arena in an effort to continue to perpetrate their fraud and oppression. The Arena's have been forced to file proceedings as a result of the defendants outrageous fraud and oppression. Further, it is important that these intentional defamatory comments are being made by an attorney whom has been practicing law for over 47 years, thereby making him a trusted source by that very nature and he has clearly abused this privilege and should be held to a higher liability standard after committing defamation against a private citizen. Furthermore, The Arena's did not bring this upon themselves, but instead encountered this as a result of the defendants deliberately committing fraud and being oppressive, therefore making it extremely

37

COMPLAINT

unacceptable that The Arena's should be enduring defamation as a result of attempting to remedy the matter. It is important for the defendants to remember that this proceeding is a matter of law and not a counseling session for Mr. DAngelo to explore his bizarre desire to control others. Unequivocally, the only issue here is that Mr. DAngelo and Ms. DAngelo have been the only parties to personally and financially gain at the expense of Mrs. Arena, while Mr. Solomon, Mr. Kubiak and Nicholas have aided and abetted such fraud.

69.     On January 17, 2014, Mr. Klonick responded to Mr. Solomon's letter and stated, "The Court has considered the points made by Mr. Soloman and I herby direct as follows: (1) Since the Plaintiff will need to be present on January 28, 2014 in order to proceed with her claim, the requested documents shall be personally delivered to the Court by 1:00 p.m. on January 28, 2014. The Court will then provide these documents to the Plaintiff so she may review these documents and proceed with her claim scheduled for 5:00 p.m. on that date." This only left Mrs. Arena a four hour window to review her personal documentation that she has a legal right to without a subpoena, of which required mathematical calculations and thorough review to present her case while Mr. DAngelo was always in possession of the documentation, creating an undue disadvantage for Mrs. Arena.

70.     On January 28, 2014, Mrs. Arena called the Perinton Town Court to inform the Court that she would be present at 1:00 PM to receive the documentation, consistent with Mr. Klonick's order. Mrs. Arena was informed, "Mr. Klonick has the documents at his law firm and we don't know when he will be at the Court. Call back in one hour." This was a red flag, as Mr. Klonick should never commingle Court matters with his personal business. When Mrs. Arena called back an hour later, she was told that Mr. Klonick would be at the Court at 3:00 PM with the documents. Mrs. Arena expressed her deep dissatisfaction and how this will not allow for an impartial proceeding. At 3:00 PM, Mrs. Arena entered the Perinton Town Court to receive the documents. She was asked to wait and continued to wait for nearly an hour. As 4:00 PM approached, it became clear that Mr. Klonick was not acting in good faith and there were alternative motives, as Mr. Klonick was fully aware that without the subpoenaed documentation, especially the Schedule K-1's, Mrs. Arena was not able to proceed with her case. As a result of Mrs. Arena being unable to proceed with an impartial hearing, she requested an adjournment. Mrs. Arena was told to put it in writing and fax it to the Court, which she immediately did and faxed it to the Perinton Town

38

COMPLAINT

Court from a local store, incurring another $25.00 expense. Mr. Klonick ignored Mrs. Arena's request and dismissed the matter. Additionally, Mrs. Arena requested her subpoenaed documentation from Mr. Klonick and she was denied that request by Mr. Klonick. Therefore, Mr. Klonick found it appropriate to mishandle Mrs. Arena's personal information, put Mrs. Arena's privacy in jeopardy, fail to hold an impartial hearing and dismiss the case upon Mrs. Arena's extremely legitimate adjournment request and the reason is simple: Mr. DAngelo lives within Mr. Klonick's jurisdiction and Mr. Klonick is an elected judge. It is important to note that The Arena's incurred (1) over $150.00 in Court related fees, (2) travel expenses and (3) lost wages from being unable to work on the day of the Court proceeding as a result of having to travel to the Court and the result was Mrs. Arena's Constitutional right to due process being violated by Mr. Klonick, a party that took an oath to uphold the Constitution and is supposed to seek justice. It is clear that Mr. DAngelo and Mr. Solomon did a significant amount of defamation and lobbying behind the scene, as this was a dramatic change and clear breach of Mrs. Arena's privacy and Mrs. Arena's rights under the United States of America Constitution and New York State Civil Practice Law & Rules § 2305(c) (which specifically grants Mrs. Arena the right to subpoenaed documentation and what makes it worse is that Mrs. Arena had a right to the documentation without a subpoena).

71. During May and June of 2014, Mrs. Arena contacted Mr. DAngelo and made the following offer: If Jonak (1) purchased Mrs. Arena's ownership in Jonak for her initial investment of $100,000.00, (2) provided Mrs. Arena with all of her Schedule K-1 income and (3) provided Mrs. Arena with all of her Schedule K-1's, Mrs. Arena would sign a Release Agreement in which Mrs. Arena would waive her right to file any past, current or future claims against Mr. DAngelo or Jonak in exchange for the $540.00 attorney fee Mrs. Arena incurred as a result of attempting to recover documents that she has a legal right to. Mrs. Arena mailed the offer to Mr. DAngelo approximately 10 times and never received a response. As part of the letter, Mrs. Arena made it clear that if Jonak did not accept the offer, Mrs. Arena was demanding (1) the balance sheet and profit and loss statement for Jonak, (2) her Schedule K-1's and (3) the liquidation of her investment in Jonak. Additionally, Mrs. Arena made it clear that she would pursue litigation against the actors involved in the fraud being committed against her if the offer was not accepted. No response was ever received.

72. In August 2014, The Arena's contacted the IRS and were able to obtain material

39

COMPLAINT

information as follows:

        i.    Income earned, but never received, by Mrs. Arena while an owner in Grandmar: 2004: $12,091, 2005: $6,492.00, 2006: $29,755.00, 2007: $2,110.00, 2008: ($97.00), Total: $50,351.00. Mrs. Arena was the minor and Mr. DAngelo was the custodian for the account. Mr. DAngelo must return to Mrs. Arena her UTMA property of $50,351.00.

        ii.    Income earned, but never received, by Mrs. Arena in her HSBC UTMA account, in which Mrs. Arena was the minor and Ms. DAngelo was the custodian: 2004: $15.00, 2005: $35.00, 2006: $112.00, 2007: $190.00, 2008: $4,381.00, Total: $4,733.00. Ms. DAngelo must return to Mrs. Arena her UTMA property of the full account balance plus $4,737.00. It is important to note that Mrs. Arena does not know what the total balance of this account was and that concealing this material information was made possible by Mr. Kubiak knowingly aiding and abetting Ms. DAngelo by refusing to provide Mrs. Arena with her HSBC Form 1099 for this account in 2009, of which Mr. Kubiak used to fraudulently file Mrs. Arena's 2009 tax returns.

        iii.    Income earned, but never received, by Mrs. Arena as a shareholder in Jonak: 2008: $4,411.00, 2009: $2,963.00, 2010: $757.00, 2011: ($2,143.00), 2012: ($287.00), Total: $5,701.00. It is clear that the income deteriorates after 2008 when Mr. DAngelo begins to engage in fraud and only continues to deteriorate, leading to losses, as Mr. DAngelo's fraud accelerates. This only demonstrates the extent that Mr. DAngelo is willing to use Jonak's capital as his personal piggy bank to satisfy his self-interests, leading to Mr. DAngelo significantly gaining, both personally and financially, at the direct loss of Mrs. Arena. It is completely unacceptable that Mrs. Arena's monies are being held hostage so that Mr. DAngelo can continue to personally and financially benefit at the clear expense of Mrs. Arena and while the opportunity costs for Mrs. Arena over the years have grown enormous.

        iv.    Although this information is valuable for the purpose of this complaint, it was explicitly expressed to The Arena's by the IRS that The Arena's need the actual Schedule K-1's to file their tax returns. The reason is obvious, but to spell it out, it is because if the IRS ever requested the Schedule K-1's and The Arena's do not have them, The Arena's can be liable for taxes and penalties.

        73.    In August 2014, The Arena's conducted another public records search for Jonak and discovered the following: (1) real estate taxes paid by Jonak as follows: 2009: $12,156.36 (45 Crescent

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Hill Road), 2011: $5,558.65 (2217 Penfield Road), 2012: $5,606.14 (2217 Penfield Road), 2013: $5,780.85 (2217 Penfield Road), 2014: $2,113.68 (2217 Penfield Road), total: $31,215.68 (not only did Mr. DAngelo fraudulently take $380,000.00 of Jonak's capital at a zero percent interest rate for the property located at 45 Crescent Hill Road and then sell the property back to himself for a substantially below market price, he used Jonak's capital to pay the property taxes for his new luxurious home, whereby creating another substantial loss for Mrs. Arena at the expense of Mr. DAngelo personally and financially gaining, (2) New York State Department of Taxation and Finance filed a judgement against Jonak on September 28, 2011 for the 45 Crescent Hill Road property taxes. The judgement was for $1,133.84 ($1,108.84 in penalties and interest and $25.00 in tax) and was satisfied by Jonak on February 17, 2012 (to make an already grave situation worse, not only did Mr. DAngelo commit fraud by using Jonak's capital to pay his property taxes, but he couldn't even pay such taxes on time, whereby creating another loss for Mrs. Arena) and (3) Monroe County real estate filing fees paid by Jonak as follows: 2008: $610.00 (65 Allerton Street), $346.00 (5701 West Wautoma Beach Road), 2009: $756.00 (45 Crescent Hill Road), 2010: $1,689.00 (45 Crescent Hill Road), $33.50 (5701 West Wautoma Beach Road), 2011: $815.50 (2217 Penfield Road), 2013: $2,404.00 (1615 Scottsville Road), Total: $6,654.00. This again represents that Mr. DAngelo personally and financially gained at the direct detriment of Mrs. Arena. All taxes and fees paid were a direct result of Mr. DAngelo's intentional fraud and as outlined above, they totaled $39,003.52. It is important to note that Jonak has incurred attorney fees and accounting fees, of which once again have only benefited Mr. DAngelo, as the the efforts of both the attorney, Mr. Solomon, and the accountant, Mr. Kubiak, have only harmed Mrs. Arena. With this said, not only have the actions of the corporation forced upon Mrs. Arena vast detriments, but the services rendered by Jonak have also had this effect, creating outrageous oppression against Mrs. Arena.

23

24

25

26

27

28

74.    On August 09, 2014, The Arena's sent an email to Mr. DAngelo and Mr. Solomon demanding the following documentation be mailed to The Arena's: (1) Mrs. Arena's Schedule K-1's from Jonak and (2) the balance sheets and profit and loss statements from Jonak. The Arena's explicitly stated the address where the documentation needed to be mailed and made it clear that if the demanded documentation was not received, The Arena's would commence this action. Mr. Solomon acknowledged the email, but did so in bad faith. Instead of Mr. Solomon replying that the demanded documentation

41

COMPLAINT

had been, or would be, mailed, Mr. Solomon responded with the sole intent of attempting to persuade The Arena's to commence their litigation in New York State Court, opposed to Federal Court, and did so for the obvious reason of Federal Court serving as a safe haven for The Arena's out of state residency and therefore, allowing for justice to prevail based upon the facts and disallowing for Mr. Solomon's deception and stalling tactics that he has attempted to use many times prior. It is important to note that Mr. Solomon was more concerned about where the Arena's would file their litigation instead of abiding by the law and mailing the demanded documentation, of which Mrs. Arena has a legal right to. This only demonstrates the conviction on behalf of the defendants to be oppressive and their desire to continue to stall The Arena's in an attempt to continue their fraud. It is clear that Mr. Solomon was hopeful that if The Arena's did commence litigation, it would be done in New York State Court where he could attempt to continue his local tactics of defamation, deception and stalling to satisfy his desire of destroying The Arena's reputation and promote injustice. The Arena's never received any of the requested documentation.

75.     In DAngelo v. DAngelo 2011 NY Slip Op 07990, Grandmar and Nicholas Sr. had appealed an order from the Monroe County Supreme Court in a divorce proceeding between Kathleen DAngelo and John DAngelo (the biological son of Nicholas Sr.), in which Grandmar was ordered to submit third-party discovery related to Grandmar UTMA accounts for the children of the plaintiff and defendant. The Supreme Court ordered the release of such documents and held that the "child support would be directly affected by any tax liability of the children or any assets held by them." Nicholas Sr. opposed the motion on the grounds that the documentation requested was "irrelevant to the underlying matrimonial action." The Appellate Division, Fourth Judicial Department, unanimously upheld the Supreme Court's decision to release the documentation and stated, "The information sought in the interrogatories concerned defendant, in his role as custodian of the children's interests in certain limited partnerships, and the information was both reasonable and necessary in plaintiff's prosecution of the matrimonial action." It is clear that Nicholas Sr. was oppressive against Kathleen DAngelo and spent significant time and resources to block Kathleen DAngelo from receiving documentation that she had a legal right to receive without a court proceeding and pursuant to EPTL 7-6.12, which sounds eerily familiar. It is clear that whenever there is a disagreement between family members, such as a divorce in this matter, either it be Nicholas Sr. or Mr. DAngelo, the parties believe that no law applies to them and they can be as oppressive as they want

42

COMPLAINT

1   without relief for the plaintiff (for Mr. DAngelo, it means that he can commit egregious fraud).

2         76.    The Arena's have acted nothing but reasonable, while Mr. DAngelo has made his attempt to

3   exert his bizarre and extreme control over Mrs. Arena's personal life well known. Further, all defendants

4   have demonstrated their intentional and complete disregard for the rights of Mrs. Arena, while committing

5   fraud and acting only in bad faith. The Arena's have only sought to exercise their legal rights, while the

6   defendants have purposely oppressed such legal rights from being exercised and beyond this, committed

7   extensive fraud and engaged in many tortious acts against The Arena's, some in retaliation of The Arena's

8   attempt to remedy the gross fraud and oppression being committed by the defendants.

9   **VI.    CLAIMS FOR RELIEF**

10        **A.    Article 7 of the New York State Estate, Powers and Trusts Law**

11              77.    Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

12              78.    The Arena's are entitled, and seek, to recover a civil money penalty against

13   defendants in an amount to be assessed by the Court.

14        **B.    Article 11 of the New York State Business Corporation Law**

15              79.    Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

16              80.    The Arena's are entitled, and seek, to recover a civil money penalty against

17   defendants in an amount to be assessed by the Court.

18        **C.    Article 7 of the New York State Business Corporation Law**

19              81.    Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

20              82.    The Arena's are entitled, and seek, to recover a civil money penalty against

21   defendants in an amount to be assessed by the Court.

22        **D.    Article 6 of the New York State Business Corporation Law**

23              83.    Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

24              84.    The Arena's are entitled, and seek, to recover a civil money penalty against

25   defendants in an amount to be assessed by the Court.

26        **E.    Article 4 of the New York State Business Corporation Law**

27              85.    Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

28              86.    The Arena's are entitled, and seek, to recover a civil money penalty against

43

COMPLAINT

1    defendants in an amount to be assessed by the Court.

2        **F.      Breach of Fiduciary Duty**

3            87.     Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

4            88.     The Arena's are entitled, and seek, to recover a civil money penalty against

5    defendants in an amount to be assessed by the Court.

6        **G.      Breach of Contract**

7            89.     Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

8            90.     The Arena's are entitled, and seek, to recover a civil money penalty against

9    defendants in an amount to be assessed by the Court.

10       **H.      Fraud**

11           91.     Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

12           92.     The Arena's are entitled, and seek, to recover a civil money penalty against

13   defendants in an amount to be assessed by the Court.

14       **I.      Constructive Fraud**

15           93.     Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

16           94.     The Arena's are entitled, and seek, to recover a civil money penalty against

17   defendants in an amount to be assessed by the Court.

18       **J.      Fraudulent Concealment**

19           95.     Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

20           96.     The Arena's are entitled, and seek, to recover a civil money penalty against

21   defendants in an amount to be assessed by the Court.

22       **K.      Negligence**

23           97.     Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

24           98.     The Arena's are entitled, and seek, to recover a civil money penalty against

25   defendants in an amount to be assessed by the Court.

26       **L.      Gross Negligence**

27           99.     Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

28           100.    The Arena's are entitled, and seek, to recover a civil money penalty against

44

COMPLAINT

1    defendants in an amount to be assessed by the Court.

2         **M.    Negligent Misrepresentation**

3              101.  Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

4              102.  The Arena's are entitled, and seek, to recover a civil money penalty against

5    defendants in an amount to be assessed by the Court.

6         **N.    Intentional Infliction of Emotional Distress**

7              103.  Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

8              104.  The Arena's are entitled, and seek, to recover a civil money penalty against

9    defendants in an amount to be assessed by the Court.

10        **O.    Defamation**

11             105.  Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

12             106.  The Arena's are entitled, and seek, to recover a civil money penalty against

13   defendants in an amount to be assessed by the Court.

14        **P.    Aiding and Abetting Fraud**

15             107.  Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

16             108.  The Arena's are entitled, and seek, to recover a civil money penalty against

17   defendants in an amount to be assessed by the Court.

18        **Q.    Aiding and Abetting Another's Breach of Fiduciary Duty**

19             109.  Plaintiffs incorporate the allegations contained in paragraphs 1-76 above.

20             110.  The Arena's are entitled, and seek, to recover a civil money penalty against

21   defendants in an amount to be assessed by the Court.

22

23

24

25

26

27

28

1

**VII.    PRAYER FOR JUDGEMENT**

2

WHEREFORE, The Arena's pray for judgement against defendants as follows:

3

A.    Order Jonak and/or Mr. DAngelo to purchase all of Mrs. Arena's shares in Jonak at their

4

current fair market value, but for no less than $100,000.00.

5

B.    Assess a reasonable interest rate that Mrs. Arena would have earned by investing her

6

original Jonak investment of $100,000.00 into mutual funds, for example, but no less than 8%

7

compounded daily for the life of the investment, which equals approximately $75,000.00, and order Jonak

8

and/or Mr. DAngelo to compensate Mrs. Arena for the said interest.

9

C.    Order Mr. DAngelo to return all of Mrs. Arena's UTMA property to her.

10

D.    Assess a reasonable interest rate that Mrs. Arena would have earned by investing her

11

UTMA monies earned from her Grandmar income totaling $50,351.00 in mutual funds, for example, but

12

no less than 8% compounded daily for the life of the investment and starting when Mrs. Arena attained the

13

age of 21 in 2009, which equals approximately $28,000.00, and order Mr. DAngelo to compensate Mrs.

14

Arena for the said interest.

15

E.    Order Ms. DAngelo to return all of Mrs. Arena's UTMA property to her.

16

F.    Assess a reasonable interest rate that Mrs. Arena would have earned by investing her

17

UTMA monies from her HSBC income earned totaling $4,737.00 and the unknown account balance in

18

mutual funds, for example, but no less than 8% compounded daily for the life of the investment and

19

starting when Mrs. Arena attained the age of 21 in 2009, which total is unknown until the account balance

20

is known and order Ms. DAngelo to compensate Mrs. Arena for the said interest.

21

G.    Assess civil money penalties against Mr. DAngelo that this Court deems just and proper,

22

but for no less than $500,000.00 (this amount excludes monies due to Mrs. Arena under (A), (B), (C) and

23

(D) above).

24

H.    Assess civil money penalties against Mr. Solomon that this Court deems just and proper,

25

but for no less than $200,000.00.

26

I.    Assess civil money penalties against Mr. Kubiak that this Court deems just and proper,

27

but for no less than $200,000.00.

28

J.    Assess civil money penalties against Nicholas that this Court deems just and proper,

46

COMPLAINT

but for no less than $100,000.00.

K.     Assess civil money penalties against Ms. DAngelo that this Court deems just and proper,

but for no less than $50,000.00 (this amount excludes monies due to Mrs. Arena under (E) and (F) above).

L.     All other relief this Court deems just and proper, including post-judgement interest,

attorneys' fees and litigation fees as appropriate, and costs of this action.

DATED: September 10, 2014                         Respectfully Submitted,

KATRINA ARENA

Address:     PO Box 3800

Jersey City, New Jersey 07303

Telephone: 201.744.0928

ANGELO ARENA

Address:     PO Box 3800

Jersey City, New Jersey 07303

Telephone: 201.744.0928

47

COMPLAINT